[Civ. No. 4307. Third Appellate District.—November 25, 1931.]

FERNHOLTZ MACHINERY COMPANY (a Corporation), Respondent, v. LEE W. WILSON et al., Appellants.

W. I. Gilbert for Appellants.

Meserve, Mumper, Hughes & Robertson, Harry W. Hanson and Timon E. Owens for Respondent.

BURROUGHS, J., *pro tem.*—This action grows out of a contract made and executed between the Fulton Engineering Company, assignor of the plaintiff herein, and Lee W. Wilson and J. Andrew McLaughlin, the defendants. By the terms of the contract, the said assignor agreed to construct for the defendants a certain placer machine in accordance with the terms of said contract, and the defendants agreed to purchase the same.

It is alleged in the complaint that the contract was fully completed on the part of the plaintiff and its assignor; that by the mutual agreement of the parties certain changes were made which had been fully executed; that in addition to the above-mentioned placer machine the plaintiff had constructed for the defendants certain "gold saving devices"; that the purchase price of said placer machine was the sum of $14,500, of which sum $5,000 had been paid by the defendants; that the principal changes made in the construction of the said placer machine consisted in making the superstructure thereof of steel instead of wood, making the trucks of caterpillar type instead of wheel type, making the excavator of rehaul type instead of gravity return type, changing the hoist track cables and lines to accommodate, making a change in the drive to permit all power for the entire machine to be taken from one motor instead of two as originally planned; that all of the said changes were of the reasonable value of $2,500; that the "gold saving devices" were constructed according to certain models and plans furnished by the defendants, and that the reasonable value thereof was the sum of $1200; that plaintiff's assignor furnished certain lumber, bolts and various materials of the reasonable value of $310; that it furnished certain steel tracks for the placer machine of the reasonable value of $160.

It is further alleged that in the erection of the machinery at the mine said plaintiff's assignor furnished extra labor of the total value of $1800. It is further alleged in the complaint that all of the foregoing were furnished at the special instance and request of the defendants, for which

the said defendants agreed to pay the reasonable value thereof. The defendants admitted the making of the contract, but denied that the placer machine had been completed; denied that any extras had been furnished or was a proper charge against them; alleged that the "gold saving devices" were manufactured by the plaintiff's assignor and that the placer machine and the devices were intended by all the parties to co-ordinate and work as one unit, whereas they did not work together, and that neither the placer machine nor the devices were properly constructed. Many other allegations of the failure of the said machine and devices to meet requirements were alleged in the answer. The court found that the allegations of the complaint were true and those of the answer were untrue and rendered judgment against the defendants for the full amount claimed by the plaintiff.

It is first contended by the appellants that the evidence is insufficient to support the findings of fact and also that certain rulings of the trial court in relation to the admission and rejection of evidence were erroneous and prejudicial to the appellants' rights. ■ Under appellants' claim that the findings of fact are without support in the evidence, it is unnecessary to cite authority to support the well settled rule of law that if the findings are supported by any substantial evidence, this court cannot interfere. In the light of this ruling we will examine the evidence.

It is admitted that the contract sued upon was executed by the parties as set forth in the pleadings; that two payments of $2,500 each were made by the defendants.

■ F. A. McAllister, who was one of the partners in the Fulton Engineering Company, testified in substance, that after the contract had been signed, the Fulton Engineering Company prepared designs and shop working details for the construction of the placer machine. The drawings were made as the work proceeded. The defendants saw the drawings and plans as the work progressed. The parties to the contract had many discussions over them, and the defendants never made any objections. The conditions to be met in the use of the machine and the handling of the material were discussed. There were certain alterations suggested. Mr. McLaughlin suggested making the excavator rolling type instead of gravity return type. This

was one of the principal changes in the machine. The defendants saw the changes in the working plan. "My recollection is that they were both pleased with it; what they wanted." That was the substance of what they said. Another suggested change was made at the instance of the defendant McLaughlin; that the trucks were to be made of the caterpillar type instead of the wheel type. There was a discussion at the time as to the cost of such a change, and the witness told McLaughlin then that the added cost of that would be about $1500. And there was some further talk about how that expense could be avoided at that particular time, and that that difficulty was avoided by omitting the true tractor type and building the truck in such a fashion that power could be applied later. At the same time, it became necessary, on account of the fact that power might be applied directly to the trucks to change the substructure from wood to steel. This was discussed with Mr. McLaughlin. There was not an exact discussion as to what that particular construction would cost. Mr. McLaughlin and Mr. Wilson saw the drawings. They were at the Fernholtz Machinery Company, where the work was being done. They both said they were well pleased with the work. The contract as originally written called for use of one gas-engine or motor on the hoist for excavation machinery, and called for Wilson and McLaughlin to furnish an auxiliary engine for driving of the screening and drilling apparatus. In discussing the matter with them, it was agreed to make a change that would enable them to cut out the auxiliary engine. McLaughlin brought the subject up; he told us to go ahead and do it. We suggested the use of a Holt tractor type model of a larger size than indicated in the contract. Mr. McLaughlin acquiesced in the use of that model. Drawings were made so that machine could be built with that model of engine. The contract provided that the defendants were to furnish certain parts which are referred to in the contract as the "gold saving devices". The witness had his first conversation about manufacturing them about a month after the contract was signed. Work had already begun on the dredger machine itself. The witness also testified that the various items of machinery were completed according to the contract, except where modified by the agreement of

the parties, and that these modifications were executed according to the said agreements; that the "gold saving devices" were manufactured according to models which were furnished to them by the defendants. The witness also testified that when completed, the machinery was all loaded f. o. b. the cars Los Angeles. It was transported on the cars to Goldfield, Nevada, for shipment to Lida, Nevada, where it was unloaded and shipped by truck from thence to the point where the plant was to be erected near Lida, Nevada. The witness further testified that an engineer was sent upon the ground, who erected the machinery as per the contract. There was much delay in finishing the machine, because, according to this witness, of the changes made and the defendants' failure to furnish the necessary labor and material and which were finally furnished by the plaintiff's assignor. The witness further testified that when completed the machine did not operate in a satisfactory manner because the "gold saving devices" could not handle all of the concentrates produced by the placer machine. Said "gold saving devices" were constructed in accordance with the model furnished by the defendants and had said "gold saving devices" been of proper design the same would have handled all of the concentrates which were produced by the placer machine. This witness further testified that at the time the defendants made the second payment the defendants both "urged us to get our bills in for the extras. Mr. Wilson said, 'Well, if you boys have your bills for extras, get them in now and we will take care of them and settle things up as we go along.' Our reply was that we had not had sufficient time to get at the extent of those extras. The bills for those extras were mailed sometime in October, after the job was completed". The witness qualified himself as an expert and gave evidence as to the reasonable value of the extra work done and the value of the "gold saving devices" and that in his opinion the amounts claimed were the reasonable value thereof. The witness, with others, made an investigation on the ground for the purpose of ascertaining if a drag line excavator would handle the amount of concentrates. According to his evidence, that was all they went to investigate. The placer machine could take care of the amount of material called for by the contract.

Robert A. Smart testified that he bought a half interest in the mine from defendant McLaughlin. He purchased a one-half interest in everything; McLaughlin told the witness that the placer machine was his and went with the mine. In the year 1925 Smart spent about $30,000 on this machine. Mr. Wilson was there some of the time when he was spending this money. He made material changes in the machine; even changing the principle of it. He could not make the "gold saving devices" work with the machine. There was a second "gold saving device" and there were other material changes made on the machine.

Vanden Heuvel, one of the copartners of the Fulton Engineering Company, testified along the same lines as did Mr. McAllister, corroborating the evidence of the latter in many details. There is also much other evidence in the voluminous record presented, which both supports and contradicts the findings of the trial court. But we are of the opinion that the evidence above cited is sufficient to sustain the material findings of the court which are the subject of attack.

It is also a contention of the appellants that it was the intent of all the parties that the placer machine and "gold saving devices" were to operate as a single unit, and that the responsibility for their failure to so operate was the fault of the plaintiff and the plaintiff's assignor. We do not read the evidence that way. The contract itself provides that the "concentrates to be fed to a hopper giving access to the gold saving devices to be furnished by parties of the second part". The evidence discloses that although the "gold saving devices" were manufactured by the assignors of plaintiff, they were made from a model furnished by the defendants. It is true they were expected to operate with the placer machine, but having been manufactured in accordance with the model furnished them by defendants no responsibility rested upon the plaintiff or its assignor. We think the principle of law here involved is well stated in section 75 of volume 22, California Jurisprudence, page 1003, where it is said:

"Where a machine or appliance is made according to plans and specifications, there is no implied assurance or warranty that it is adequate to the buyer's purpose. . . .

If the article corresponds with the plans and specifications, the manufacturer cannot be held liable."

In the instant case the "gold saving devices" were to be furnished by the appellants. They were manufactured according to a model furnished by them. There is no complaint that they were not built according to the model, but that they did not co-ordinate with the placer machine which the court has held upon sufficient evidence was built according to the contract and agreements of the parties. Cases in point are: *Bancroft* v. *San Francisco Tool Co.,* 120 Cal. 228 [52 Pac. 496]; *Madera Sugar Pine Co.* v. *Norman B. Livermore & Co.,* 179 Cal. 116 [175 Pac. 456]. After a careful examination of the entire record we are satisfied that the findings of the court are sustained by substantial evidence.

Complaint is also made that the court erred in the admission of certain evidence. The evidence objected to was the opinion of the witnesses McAllister and Vanden Heuvel that the machine was completed in conformity with the specifications of the contract, with the exception of the changes which had been made by oral agreement. It is claimed by the appellants that this was calling for the conclusion of the witnesses. It appears that the witnesses are mechanical engineers and constructors; that they had had supervision of construction and were familiar with that kind of work and had charge of this particular job. The court overruled the objections and the witnesses answered yes. A number of other objections were made to similar questions and overruled by the court. We think the rulings were correct. The witnesses were experts in that line of work. They had had immediate supervision and control of this particular work, and therefore they were in a position to assist the court by their answers. Furthermore they were subject to cross-examination and were cross-examined. This is the ruling laid down in *Thomas Haverty Co.* v. *Jones,* 185 Cal. 285 [197 Pac. 105].

Complaint is also made that the court erred in sustaining objections made by the plaintiff to questions asked of the witness Vanden Heuvel to the effect that defendants were to pay $2,500 on the signing of the contract; a further $2,500 and the freight when the machinery was ready for shipment. These objections were properly sustained. The

contract provided for the two payments which were made as stated, and also that the machine was to be delivered f. o. b. cars Los Angeles. ▮ We are of the opinion that the term "f. o. b." as used in the contract has a well settled meaning, that is, to be delivered free of all charge and expense of transportation up to and including the actual delivery of the article on board the cars at Los Angeles. (*J. K. Armsby Co.* v. *Blum,* 137 Cal. 552 [70 Pac. 669].)

▮ Another reason advanced for a reversal of the judgment is based upon the fact that the respondent's assignor knew the purpose for which the appellants were having the machine and "gold saving devices" manufactured and therefore it guaranteed its fitness for the purpose for which it was intended. We think this contention is answered by the fact that the placer machine did conform, according to the evidence, to the plans and specifications, and was able to perform according to the requirements, the difficulty being with the inability of the "gold saving devices" to handle the concentrates put forth by the placer machine, and, as heretofore said, these devices were made under the direction of defendants.

▮ There is another reason why the judgment must be affirmed. The defendant McLaughlin with the knowledge and acquiescence of his co-defendant sold to one R. F. Smart his one-half interest in the mining property referred to, including this machinery. Thereafter Smart, with the knowledge and consent of Wilson, spent about $30,000 rebuilding the machine. In so doing, the entire principle of the machine was changed. Both the sale and the rebuilding were unknown to the plaintiff or its assignor. We are of the opinion that by these acts of ownership the defendants cannot now be heard to say that they never accepted delivery of the machine. (2 Black on Rescission of Contracts, p. 1336; *McLean* v. *Clapp,* 141 U. S. 429 [35 L. Ed. 804, 12 Sup. Ct. Rep. 29, see, also, Rose's U. S. Notes].)

Other objections are made to the soundness of the judgment, but we have examined each one of them and are of the opinion that the judgment is right and must be affirmed. It is so ordered.

Thompson (R. L.), J., and Plummer, Acting P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on December 24, 1931, and an application by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 21, 1932.