HOLMES PACKAGING MACHINERY CORP., Plaintiff and Appellant, v. BYRUM C. BINGHAM, Defendant and Respondent.

864

O'Donnell, Waiss & McComish and Paul W. McComish for Plaintiff and Appellant.

William L. Ferdon, A. Lawrence Chickering III and Chickering & Gregory for Defendant and Respondent.

MOLINARI, P. J.—In this action brought by plaintiff, Holmes Packaging Machinery Corp., to recover from defendant, Byrum C. Bingham, money allegedly due in the form of rent under two leases of personal property, further to recover attorney's fees under these agreements, and finally to have the respective rights of the parties under these agreements determined, Holmes appeals from a judgment in favor of Bingham.[1] The basis of the trial court's judgment being that Bingham was entitled to rescind the leases because of Holmes' breach of implied warranties that the property leased thereunder was of merchantable quality and fit for the purpose for which it was leased,[2] Holmes' contention on appeal is that such implied warranties are not applicable in the instant case.

In the early months of 1963[3] Dulasur Equipment Company marketed a process for converting blackwall automobile tires into whitewall tires. The equipment which Dulasur marketed to accomplish this operation consisted of a commercial trailer, the interior of which was specially equipped with vulcanizing equipment. The trailer was designed to be towed from location to location and connected to the local electrical supply of a particular used tire or automobile dealer.

While in Sacramento sometime in February or March, Bingham had occasion to inspect one of such specially equipped trailers marketed by Dulasur. As a result of the interest which Bingham displayed in this apparatus and the operation it performed, he was visited at his Redding place of business by William Werden, the general sales manager of Dulasur. Werden made various representations to Bingham concerning the equipment and in addition delivered to Bingham a brochure and colored photograph describing the virtue

---

[1] The judgment also determined that Bingham was entitled to nothing under his counterclaim for damages based on Holmes' alleged breach of warranty. However, Bingham has not appealed from the judgment.

[2] The issues relating to Holmes' breach of warranty were raised by Bingham by way of defense as well as by counterclaim.

[3] Unless otherwise indicated, all dates refer to the year 1963.

of the whitewall vulcanizing process which Dulasur had developed and further setting forth the benefits to be derived from becoming a franchisee of the Dulasur process and equipment. Thereafter in March Bingham and Dulasur executed two agreements by which the former purchased two franchises for the use of Dulasur's process and equipment, these franchises covering territories in the vicinity of Redding and San Diego. Both agreements contemplated Bingham's leasing of the specially equipped trailers from Dulasur.

Following the execution of these two franchise agreements Werden approached Holmes' manager, George Husvar, with a proposal that Holmes purchase two of Dulasur's specially equipped trailers and lease them to Bingham. At this time Holmes had had no prior dealings with Dulasur or with tire vulcanizing equipment and no employee of Holmes knew anything about such equipment or had ever seen or inspected Dulasur's specially equipped trailer. In addition Holmes and Bingham had had no prior dealings and had never heard of one another. Thereafter, based on the approval of Bingham's credit, Holmes, through Husvar, executed two identical lease agreements, one for each unit of equipment. Werden then presented these agreements to Bingham, who signed them and returned them by mail to Holmes. Each agreement provided for the lease of one "21′ Hood Commercial Trailer Complete with Whitewall Vulcanizing Equipment," further provided for a lease term of 50 months commencing on the date of delivery of the equipment, which was specified as April, and finally provided for a monthly rental in the amount of $440. Included in the "General Conditions" of each lease were the following provisions: "1. Lessee agrees that it will, within forty-eight (48) hours after the delivery of the personal property herein leased, inspect said personal property and notify Lessor in writing of any objections as to its condition. The failure of Lessee to so inspect and notify Lessor within said period as to any defect therein shall be held to be a waiver of any and all defects in said equipment and conclusively presumed that Lessee shall have accepted the same in good order and condition. . . . 17. Lessee agrees that in executing said lease that it has satisfied itself that the equipment leased hereunder is of a size, design, and/or capacity as selected and approved by it and that Lessee is satisfied that the same is suitable for its purposes and that there have been no representations on the part of Lessor with respect to the

quality, suitability, or design for a particular purpose on the part of Lessor had and made other than herein expressed.''

Thereafter, as a result of correspondence between Husvar and Bingham, a written modification to the lease agreements was executed. This modification agreement provided that at the end of the 50-month lease term Bingham could continue leasing the equipment at the reduced rate of one monthly payment per year or, alternatively, that Bingham could have title to the subject equipment by paying a $2 termination charge. In addition, the modification provided that at any time during the term of the leases Bingham could accelerate the contracts and prepay all rental installments in return for which Holmes would convey to Bingham title to the subject property.

In April, following execution of the two lease agreements, Dulasur delivered the two units which were the subject matter of the leases to Bingham, one being delivered to Redding and the other to San Diego. Shortly thereafter and without seeing or inspecting either unit Holmes entered into a purchase agreement with Dulasur in regard to the two trailers and paid Dulasur for the trailers.

Shortly after the two trailers were delivered to Bingham, Bingham encountered difficulties in operating them. According to the testimony of two of Bingham's employees who were assigned to operate the whitewall vulcanizing equipment, the equipment was found to be defective in the following particulars: various tire molds became inoperable due to the fact that the thermostats burned out and jiggled loose when the equipment was moved, wires burned out, lights failed to function, the air compressor motor burned out, and the trailers were not equipped to tie into the fuse boxes located in the used car lots where the trailers were to operate and thus could not obtain power.

Commencing in July Bingham failed to make rental payments due under the two agreements and on July 24 Bingham served Holmes with a notice of rescission. In this notice Bingham enumerated the equipment's various defects, gave notice of a breach of warranty in that the equipment was not fit for the purpose for which it was manufactured nor was it of merchantable quality, and offered to return the trailers and equipment to Holmes. Holmes having taken no action in response to this notice of rescission, this action followed.

As revealed by the findings of fact and the conclusions of

law which the trial court entered, the trial court's determination that Bingham was entitled to rescind the lease agreements which he had entered into with Holmes, and its further determination that after Bingham gave Holmes notice of rescission no money became due to the latter by way of rent under the two agreements, were based upon the court's determination that in leasing the trailers and vulcanizing equipment to Bingham, Holmes impliedly warranted that the equipment "would be workable and fit for the purpose for which manufactured and of merchantable quality," and that because the trailers and equipment were "defective . . . failed to function and became inoperable . . . were completely unsuitable for the purpose for which they were leased . . . and . . . were not in a condition fit for their intended use," these implied warranties were breached by Holmes. The issue which this appeal poses, therefore, is whether such implied warranties, namely, that the equipment be of merchantable quality and that it be fit for the purpose for which it was supplied, existed in the instant case so as to give Bingham a right of rescission upon their breach.

In asserting the applicability of such warranties to the instant case, Bingham relies upon the provisions of Civil Code section 1955[4] which provides, in pertinent part, as follows: "One who lets personal property must deliver it to the hirer, . . . put it in a condition fit for the purpose for which he lets it, and repair all deteriorations thereof not occasioned by the fault of the hirer and not the natural result of its use."
■ This section contains a statutory declaration of the obligations of a lessor of personalty (*Sproul* v. *Cuddy*, 131 Cal.App. 2d 85 93 [280 P.2d 158]) and is an expression of the duty of a bailor in terms of an implied warranty of the fitness of the chattel for the use intended. (*Tierstein* v. *Licht*, 174 Cal.App. 2d 835, 841 [345 P.2d 341].) It is not, however, an absolute warranty, making the bailor an insurer or guarantor. (*Tierstein* v. *Licht, supra.*) In actions for damages for personal injuries resulting from the use of the lease chattel, section 1955 has been held to provide for an implied warranty by the bailor that he has exercised reasonable care to ascertain that the chattel is safe and suitable for the purposes for which it is hired, the essential inquiry being whether the hirer complied with the standard of reasonable care in ascertaining the fit-

---

. [4]Unless otherwise indicated, all statutory references are to the Civil Code.

ness of the chattel for the use for which he knew it was hired.[5] (*Tierstein* v. *Licht, supra*; *Sproul* v. *Cuddy, supra*; see *Rohar* v. *Osborne*, 133 Cal.App.2d 345, 352 [284 P.2d 125].)

The duty imposed under section 1955 that one who hires a chattel for the use of others ordinarily assumes a duty to furnish a proper and reasonably safe chattel, and that he is liable for injuries which may result from his negligence to one using the chattel, finds its basis in the duty to exercise ordinary care which is due to everybody under the principles declared in sections 1708, 1714, and 3281, respectively, defining the duty to abstain from injuring the person and property of another, negligence, and the right to recover damages therefor. (*Tierstein* v. *Licht, supra*, 174 Cal.App.2d 835, at pp. 839-840; *Dahms* v. *General Elevator Co.*, 214 Cal. 733, 737-742 [7 P.2d 1013].) Accordingly, section 1714, defining negligence, and section 1955, defining the obligations of a letter of personal property, must be read together. (*Monroe* v. *East Bay Rental Service*, 111 Cal.App.2d 574, 576 [245 P.2d 9].)

However, in cases involving the unfitness of a chattel to perform the work or purpose for which it was hired, as in the instant case, section 1955 has a limited scope. While it is true that under section 1955 the letter impliedly warrants that the personal property hired is in a condition fit for the purpose for which he lets it, the sole remedy for a breach of the warranty provided for in section 1955 is that contained in section 1957, which provides as follows: *"If a letter fails to fulfill his obligations, as prescribed by section nineteen hundred and fifty five, the hirer, after giving him notice to do so, if such notice can conveniently be given, may expend any reasonable amount necessary to make good the letter's default, and may recover such amount from him."* (Italics added; see *Baker* v. *Gibson*, 14 Cal.2d 59, 65 [92 P.2d 796]; *Riskas* v. *De La Montanya*, 145 Cal.App.2d 636, 639 [302 P.2d 821]; *Pugh-Miller Drilling Co.* v. *Main Oil Co.*, 98 Cal.App. 297, 300 [276 P. 1043]; *McFayden* v. *Town of Calistoga*, 74 Cal.App. 378, 384 [240 P. 523]; and see *Whitty* v. *Fidelity & Deposit Co.*, 123 Cal.App. 334, 338 [11 P.2d 84].)

---

[5]This duty is equated with the warranty implied from the common law of bailments that a bailor of a chattel impliedly warrants "that he has exercised reasonable care to ascertain that the chattel is safe and suitable for the purpose for which it is hired." (*McNeal* v. *Greenberg*, 40 Cal.2d 740, 742 [255 P.2d 810]; *Tierstein* v. *Licht, supra; Sproul* v. *Cuddy, supra*, 131 Cal.App.2d 85.)

In the instant case Bingham did not avail himself of the remedy afforded by section 1957, but instead attempted to rescind the lease agreements. Under the circumstances, he could not avail himself of the implied warranty provided for in section 1955. Our inquiry, therefore, in view of the trial court's findings that Holmes breached implied warranties that the leased equipment was of merchantable quality and fit for the purpose for which it was leased, is whether there are any warranties, other than those provided in section 1955, implied in bailment or lease contracts.

At the time the agreements between Holmes and Bingham were executed, statutory references to implied warranties of merchantability and fitness for purpose were found in section 1735.[6] Since this section is limited to sales and contracts of sale, it is not directly applicable to the instant case which involves a bailment contract. (See *Aced* v. *Hobbs-Sesack Plumbing Co.*, 55 Cal.2d 573, 582 [12 Cal.Rptr. 257, 360 P.2d 897]; *Corporation of Presiding Bishop* v. *Cavanaugh*, 217 Cal.App.2d 492, 504 [32 Cal.Rptr. 144]; *Amacorp Industrial Leasing Co.* v. *Robert C. Young Associates, Inc.*, 237 Cal.App. 2d 724, 728-729 [47 Cal.Rptr. 294].) However, it has been held in California that warranties similar to those provided for in section 1735 may be implied in nonsale transactions where the transaction is of such a nature that the implication

---

[6]Section 1735, which was supplanted by Commercial Code section 2314, 2315, and 2316, effective January 1, 1965, imposed implied warranties in sales and contracts of sale as follows:

"Subject to the provisions of this act and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose.

"(2) Where the goods are bought by description from a seller who deals in goods of that description (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be of merchantable quality.

"(3) If the buyer has examined the goods, there is no implied warranty as regards defects which such examination ought to have revealed.

"(4) In the case of a contract to sell or a sale of a specified article under its patent or other trade name, there is no implied warranty as to its fitness for any particular purpose.

"(5) An implied warranty or condition as to the quality or fitness for a particular purpose may be annexed by the usage of trade.

"(6) An express warranty or condition does not negative a warranty or condition implied under this act unless inconsistent therewith."

of such warranties is justified. (*Aced* v. *Hobbs-Sesack Plumbing Co., supra*; *Corporation of Presiding Bishop* v. *Cavanaugh, supra*.) In such situations, the provisions of section 1735, while not directly applicable, may be used as guidelines as to the existence of such implied warranties and the elements necessary for their application. (*Corporation of Presiding Bishop* v. *Cavanaugh, supra,* at p. 514.) Accordingly, the provisions of section 1735 have been used by analogy to create implied warranties in construction contracts and contracts for labor and material. (*Aced* v. *Hobbs-Sesack Plumbing Co., supra,* and cases cited therein; *Corporation of Presiding Bishop* v. *Cavanaugh, supra*.)

In *Rainbow Petroleum Co.* v. *Union Drilling & Petroleum Co.,* 115 Cal.App. 275 [1 P.2d 489], an action was brought by the bailor of piping against the bailee for the rental due under the written contract executed by the parties. Despite the bailee's defense that the piping was defective and that therefore the bailor breached an implied warranty relating to the quality of the piping, the trial court awarded judgment to the plaintiff-bailor for the rental due. That judgment was affirmed on appeal, the court concluding that no implied warranties existed under the facts of that case. We note with interest, however, that in reaching this conclusion the appellate court made no mention of section 1955, which has existed in the Civil Code since 1872; rather its conclusion was predicated upon the law with regard to warranties in sales transactions as that law existed at the time *Rainbow* was decided, i.e., prior to the adoption of section 1735. Thus, although as a result of California's adoption of section 1735 in 1931 the law with regard to such warranties in sale transactions has been changed since the *Rainbow* case, this case seems to suggest that the law with relation to implied warranties in bailment contracts should by analogy be the same as that with regard to implied warranties in sale contracts.

In jurisdictions outside of California there is considerable authority indicating that it is the general rule that, aside from statute and based upon the common law, the concept of warranties arising by implication of law does have a place in bailment contracts, and that the warranties which are implied in bailments are analogous to those imposed in sales or contracts of sale. (See 8 Am.Jur.2d, Bailments, § 144, p. 1039; 8 C.J.S., Bailments, § 25, p. 380; 31 A.L.R. 541; 68 A.L.R.2d 854; 57 Colum.L.Rev. 653, 655; 2 Vand.L.Rev. 675, 678;

4 Williston, Contracts (rev. ed.) § 1041; *Hartford Battery Sales Corp.* v. *Price,* 119 Pa.Super. 165 [181 A. 95, 98]; *Hatten Machinery Co.* v. *Bruch,* 59 Wn.2d 757 [370 P.2d 600, 602-603]; *Milwaukee Tank Works* v. *Metals Coating Co.* 196 Wis. 191 [218 N.W. 835, 836]; *Standard Oil Co. of New York* v. *Boyle,* 231 App.Div. 101 [246 N.Y.S. 142, 144]; *Demos Const. Co.* v. *Service Supply Corp.,* 153 Pa.Super. 623 [34 A.2d 828, 829-830]; *Hoisting Engine Sales Co.* v. *Hart,* 237 N.Y. 30 [142 N.E. 342, 344, 31 A.L.R. 536]; *Levin* v. *Siver,* 27 Ill.App. 2d 134 [169 N.E.2d 156].) Some of the cases cite statutes and cases dealing with implied warranties in the law of sales (*Pennsylvania R. Co.* v. *J. Jacob Shannon & Co.,* 363 Pa. 438 [70 A.2d 321, 324]; *Demos Const. Co.* v. *Service Supply Corp., supra; Hoisting Engine Sales Co.* v. *Hart, supra*); others refuse to impose an implied warranty where such warranty would not arise under sales law, e.g., where the bailee has inspected the goods (*Gaffey* v. *Forgione & Romano Co.,* 126 Me. 220 [137 A. 218, 219]; *Electrical Advertising, Inc.* v. *Sakato,* 94 Ariz. 68 [381 P.2d 755, 757]; 68 A.L.R.2d 859; 31 A.L.R. 544), where the selection of goods is made by the bailee (*Pennsylvania R. Co.,* v. *J. Jacob Shannon & Co., supra; Gaffey* v. *Forgione & Romano Co., supra;* 68 A.L.R.2d 861), where the goods are leased under their trade or patent name (*Pennsylvania R. Co.* v. *J. Jacob Shannon & Co., supra; Demos Const. Co.* v. *Service Supply Corp., supra; Sebastianelli* v. *Frank,* 108 Pa.Super. 550 [165 A. 664, 665]), or where the bailee does not rely on the bailor's skill or judgment (*Electrical Advertising, Inc.* v. *Sakato, supra*).

Turning to the law in California as to the question of implied warranties in bailment contracts, we note that Bingham, in arguing that a bailor impliedly warrants that the goods which he furnishes will be fit, relies in part upon the cases of *McNeal* v. *Greenberg, supra,* and *Sproul* v. *Cuddy, supra,* and the statements made therein that a bailor impliedly warrants "that he has exercised reasonable care to ascertain that the chattel is safe and suitable for the purpose for which it is hired." (40 Cal.2d at p. 742; 131 Cal.App.2d at p. 93.) As already pointed out, those cases both involved tort actions for damages for injuries sustained as a result of defective conditions of the leased property. Moreover, the language upon which Bingham relies, which has its source in section 408 of the Restatement of Torts, sounds peculiarly in tort by virtue of its use of the term "reasonable care" and its refer-

ence to the safety of the goods. Thus, it is clear that the implied warranties which were employed in those cases were employed as a means of establishing the basis of the bailor's duty for tort purposes in order to allow recovery for personal injuries sustained by the bailee as a result of a defective condition of the goods.

We conclude, therefore, that the implied warranties which are applicable in bailment contracts are analogous to those applicable in sale transactions, and we proceed to analyze the instant case within the ambit of section 1735 providing that goods be of merchantable quality and that they be fit for the purpose for which they are furnished. It is settled that the implied warranties specified in section 1735 do not arise from any agreement in fact of the parties but are instead created by operation of law in situations where all the requisite elements for the creation of the warranties exist. (*Ritchie* v. *Anchor Casualty Co.*, 135 Cal.App.2d 245, 255-256 [286 P.2d 1000]; *Intrastate Credit Service, Inc.* v. *Pervo Paint Co.*, 236 Cal.App.2d 547, 550 [48 Cal.Rptr. 182].)

However, it is also well established that the party relying upon an implied warranty has the burden of proving that there was one by showing the existence of each of the constituent elements of the warranty. (*Intrastate Credit Service, Inc.* v. *Pervo Paint Co.*, supra; *Tidlund* v. *Seven Up Bottling Co.*, 154 Cal.App.2d 663, 666 [316 P.2d 656]; *Vaccarezza* v. *Sanguinetti*, 71 Cal.App.2d 687, 690-691 [163 P.2d 470].)

Concerning ourselves initially with the implied warranty that the goods be fit for the purpose for which they are furnished, we note that by definition the warranty cannot be implied in a sale transaction where the buyer does not rely on the seller's skill or judgment in furnishing such goods. (*Sutter* v. *Associated Seed Growers, Inc.*, 31 Cal.App.2d 543, 546 [88 P.2d 144]; *Odell* v. *Frueh*, 146 Cal.App.2d 504, 510 [304 P.2d 45, 76 A.L.R.2d 345].) By analogy, in a bailment situation in order for such an implied warranty to arise there must be reliance by the bailee upon the bailor's skill or judgment. In the instant case the record is devoid of evidence showing such reliance by Bingham upon Holmes' skill or judgment. Rather the evidence reveals that Bingham, through his inspection of a model of Dulasur's trailer and vulcanizing equipment and through his negotiations with Werden of Dulasur, satisfied himself that the equipment would be suitable for the purpose of changing blackwall tires

to whitewall tires; that Bingham had no dealings with any representative of Holmes, which came into the picture only after Bingham had consummated his negotiations with Dulasur for purchase of franchises for use of the equipment and the Dulasur process and after Bingham had committed himself to Dulasur to lease the equipment; and that Holmes' involvement in the transaction was merely that of a financier. This being the undisputed evidence in this case concerning the nature of the relationship between Holmes and Bingham, we conclude that Bingham in no way relied upon Holmes' skill and judgment in leasing the trailers and vulcanizing equipment and that therefore no implied warranty of fitness for purpose existed in the instant case.

The situation in the instant case is, we believe, akin to the situation in sale transactions where the seller furnishes the buyer with goods which correspond to plans and specifications furnished by the buyer. In such a situation it has been held that there is no implied warranty running from the seller to the buyer that the goods are fit for the purpose for which they are supplied. (*Fernholtz Machinery Co.* v. *Wilson,* 118 Cal. App. 573, 581 [5 P.2d 679] ; *Corporation of Presiding Bishop* v. *Cavanaugh, supra,* 217 Cal.App.2d, at pp. 508-509, and cases cited therein.) In the instant case Holmes merely leased to Bingham items which Bingham, through Dulasur, requested. Thus no implied warranty of fitness for a particular purpose arose.

Turning to the question of whether Holmes impliedly warranted that the two trailers and equipment which it leased to Bingham be of merchantable quality, that is, that they be reasonably suitable for the ordinary use for which they were manufactured (*Simmons* v. *Rhodes & Jamieson, Ltd.,* 46 Cal.2d 190, 194 [293 P.2d 26] ; *Burr* v. *Sherwin Williams Co.,* 42 Cal.2d 682, 694 [268 P.2d 1041] ; *Aced* v. *Hobbs-Sesack Plumbing Co., supra,* 55 Cal.2d 573, at p. 582; *Moore* v. *Hubbard & Johnson Lumber Co.,* 149 Cal.App.2d 236, 240-241 [308 P.2d 794]), we similarly conclude that no such implied warranty existed in the instant case. According to subdivision (2) of section 1735 such an implied warranty exists in sale transactions where goods are bought by description from a seller who deals in goods of that description. By analogy the implied warranty of merchantable quality which would exist in bailment situations would require that the leased goods be leased by description from a lessor who deals

in goods of that description. In the instant case the record is devoid of evidence showing that Holmes dealt in goods of the kind which Bingham leased from it. To the contrary, the undisputed evidence reveals that prior to execution of the subject lease agreements no employee of Holmes had knowledge of Dulasur's equipment or had ever inspected such equipment. Accordingly the conclusion is inescapable that Holmes did not deal in goods of this kind so as to give rise to an implied warranty on the part of Holmes that the trailers and vulcanizing equipment be of merchantable quality.

We are satisfied, moreover, that even if it could be said that the implied warranties under discussion were applicable, they were nevertheless effectively disclaimed by Holmes under the provisions of the lease agreements. In section 1791, as in force at the times herein involved,[7] it was provided in pertinent part that "Where any right, duty or liability would arise under a contract to sell or a sale by implication of law, it may be negatived or varied by express agreement . . . ."  In *Burr* v. *Sherwin Williams Co.*, *supra*, 42 Cal.2d 682, at page 693, the Supreme Court, citing section 1791 and other authorities, stated that "The statutory implied warranties of quality can, of course, be disclaimed by the seller, provided the buyer has knowledge or is chargeable with notice of the disclaimer before the bargain is complete. [Citations.]" (See also *Delta Air Lines, Inc.* v. *Douglas Aircraft Co.*, 238 Cal.App.2d 95, 101 [47 Cal.Rptr. 518]; and see *Vandermark* v. *Ford Motor Co.*, 61 Cal.2d 256, 262-263 [37 Cal.Rptr. 896, 391 P.2d 168].)

Whatever misgivings may have arisen with respect to the validity of exculpatory clauses in negligence cases and the resultant rule that such clauses are void as against public policy where they affect the public interest (see *Vandermark* v. *Ford Motor Co.*, *supra*, 61 Cal.2d 256; *Tunkl* v. *Regents of University of California*, 60 Cal.2d 92, 96 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693]), this rule has not been extended to disclaimer of statutory warranties involving only an exculpation from contractual liability. (See *Vandermark* v. *Ford Motor Co.*, *supra*; *Delta Air Lines, Inc.* v. *Douglas Aircraft Co.*, *supra*, 238 Cal.App.2d 95, at p. 101.) The cases hold, moreover, that even a contract exempting one from lia-

---

[7]This section was superseded on January 1, 1965 by Commercial Code section 2316.

bility for his own negligence is not necessarily invalid, the applicable rule being that such exculpation is valid if it does not affect the "public interest." (*Tunkl* v. *Regents of University of California, supra*; *Delta Air Lines, Inc.* v. *Douglas, supra.*) The rationale behind this rule is, as stated in *Tunkl*, that ". . . no public policy opposes private, voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party, . . ." (P. 101.)

In the light of the foregoing authorities, radiated by the rationale of *Tunkl,* we are satisfied that the disclaimer clause contained in the lease agreement, while it is to be strictly construed against Holmes, is sufficiently broad to effectively disclaim and negative the implied warranties of merchantability and fitness for Bingham's particular purpose provided for in section 1735. (See *Burr* v. *Sherwin Williams Co., supra*, 42 Cal.2d 682, at pp. 693-694; *Couts* v. *Sperry Flour Co.*, 85 Cal.App. 156, 159 [259 P. 108].)

On the basis that no implied warranties arose in this case and that in any event, there was an effective disclaimer of warranties, we conclude that Bingham was not entitled to rescind the lease agreements and to refuse payments thereunder. Under the circumstances Holmes is entitled to a judgment for the accrued rent and for the reasonable attorney's fees provided for in the lease agreements. We find nothing in the record which impels us to order a new trial. The case was fully tried and there is no necessity to take further evidence. Accordingly, it is appropriate to remand the cause with directions to the trial court to make adequate findings on all issues involved, including the determination of the reasonable attorney's fee to be awarded Holmes, based on the evidence now before it, and in conformity with the views herein expressed to draw proper conclusions therefrom; and to enter judgment accordingly in favor of Holmes.

It is ordered, therefore, that the judgment be reversed and that the cause be remanded with directions to the trial court to set aside the judgment and the findings of fact and conclusions of law; to make and file findings of fact upon the issues involved in conformity with the views herein expressed; to draw proper conclusions of law therefrom; and to enter judgment accordingly in favor of Holmes.

Sims, J., and Elkington, J., concurred.

A petition for a rehearing was denied August 18, 1967, and respondent's petition for a hearing by the Supreme Court was denied September 21, 1967. Peters, J., was of the opinion that the petition should be granted.

[Crim. No. 6039.   First Dist., Div. One.   July 26, 1967.]