538 P.2d 1177

**ALL–STATES LEASING COMPANY,
Plaintiff-Appellant,**

**v.**

**Noah BASS, dba Bass Phillips "66" Station,
Defendant-Respondent.**

**No. 11353.**

Supreme Court of Idaho.

Aug. 6, 1975.

Roger D. Cox, of Cox, Fanning & McNamara, Idaho Falls, for plaintiff-appellant.

Paul T. Baird, of Clemons, Cosho, Humphrey & Samuelson, Boise, for defendant-respondent.

McQUADE, Chief Justice.

Plaintiff-appellant All-States Leasing Company (hereinafter appellant or lessor) brought this action for money allegedly due from defendant-respondent Noah Bass, doing business as Bass Phillips "66" Station in Boise (hereinafter respondent or lessee). The money due is in the form of rent under a lease of personal property which appellant claimed respondent breached. Appellant further sought to recover costs and attorney fees. The trial court, sitting without a jury, denied appellant's claim and entered judgment for the respondent. From this judgment appellant brings this appeal. We reverse and remand for a disposition of the cause in con-

formity with the views expressed in this opinion.

The facts of this dispute may be summarized as follows. Sometime prior to July 2, 1969, respondent answered an advertisement in a trade journal for a "Budg-O-Matic Car Wash System." On July 2, 1969, respondent was contacted in person at his place of business by two salesmen. These salesmen were employed by Auto Laundry Manufacturing Company, of Seattle, Washington, engaged in the manufacture of Budg-O-Matic Car Wash Systems. After talking with the two salesmen respondent decided that he wanted the car wash system for use in his business. At the suggestion of the salesmen, a lease arrangement was negotiated, whereby the car washing equipment was to be leased to respondent by appellant rather than purchased outright. The trial court found that although Auto Laundry Manufacturing Co. had done business with appellant for several months prior to the transaction in issue, whereby on several occasions, numbering approximately 40, appellant would purchase a Budg-O-Matic Car Wash System from the manufacturer, Auto Laundry Manufacturing Co., and lease it to the service stations for use as a coin-operated car washer, no agency relationship existed between the two.

At the conclusion of the negotiations the salesmen provided two forms for respondent to sign. One was a lease application form, the other a lease arrangement form. The former set forth pertinent information as to respondent's business and described the equipment to be leased. The latter set forth the terms of the lease agreement. Both were business forms of appellant and bore the name of All-States Leasing Company conspicuously on their face.

Under the terms of the lease agreement, respondent agreed to lease the car wash system from appellant for a term of 36 months, making monthly payments of $129.79. One of the terms provided that respondent would assume all risk of loss and damage to the equipment. Respond-

ent was also responsible for property taxes on the equipment during the term of the lease. Respondent was given the option of renewing the lease at the expiration of its term. However title at all times was to remain in the name of the lessor. No disclaimers of any warranties appeared in the lease.

At the time respondent signed both of these lease forms, he executed a check in favor of Auto Laundry Manufacturing Co. for $189.00. This reflected part of a down payment of approximately $389.00 to which respondent agreed. The remaining $200.00 still owing on the down payment was to be paid at the time the system was installed. Respondent testified that he had at all times thought he was dealing with one company with regard to the negotiations for the lease, and the execution of all documents surrounding the lease. Although he acknowledged that he had been aware of the name of Auto Laundry Manufacturing Company, as well as appellant's name, he assumed both were merely two divisions of one company.

On July 23, 1969, a delivery man from the state of Washington delivered the car wash system to respondent. Respondent was requested to and did sign a completion certificate acknowledging that the car wash system was delivered to the correct location in proper condition, and was in full compliance with the terms and specifications of the lease agreement. At the same time respondent wrote a check payable to appellant in the amount of $200.00, which was still owing on the down payment under the terms of the lease.

A short time after the car wash was installed, respondent received a correspondence from appellant pertaining to the lease agreement which he had signed on July 2, 1969. Enclosed with this correspondence was a new lease agreement which appellant explained had been prepared to correct a $.10 error in the agreed upon monthly payment. Respondent testified that he checked the computations, signed the new lease agreement form but

did not bother to read the new lease agreement carefully before returning it to appellant because he was not aware that this new agreement contained any terms different from the first agreement. This revised lease agreement contained in paragraph 4 a disclaimer of all warranties with respect to the leased property. Appellant acknowledged receipt of the new lease agreement in a letter sent to respondent on August 25, 1969. The trial court found that at some point prior to this letter of August 25, 1969, appellant purchased the Budg-O-Matic Car Wash System from Auto Laundry Manufacturing Co., and then in turn leased it to respondent.

Respondent made two monthly payments on the lease with the last monthly payment being made in October, 1969, but thereafter refused to make additional payments. In November and again in December of 1969, respondent wrote to appellant requesting that it take the Budg-O-Matic unit back. In the November letter respondent informed appellant that the car wash machine wasn't producing enough revenue to make its payments, and that he told the salesmen from appellant's organization that if it didn't make its payments and show a profit, he would not keep it. In the December letter, respondent reaffirmed his wish that appellant remove the car wash system and for the first time referred to the system's inability to function without freezing up in the cold weather. Appellant responded to these letters in a correspondence dated, December 10, 1969, whereupon it informed respondent that "The dealer who sold this unit to you originally is presently out of town and will return sometime next week, at which time we will contact him for help in disposing of your unit." Respondent testified that he was never contacted by anyone after receiving this letter, nor did anyone pick up the machine as of the date of trial.

On October 12, 1970, appellant brought this action against the respondent for rentals due under the lease agreement after respondent refused to make further payments. Respondent in his answer to the complaint contended that the lease was null and void because of alleged misrepresentations concerning the quality and expected performance of the car wash system made on the part of the two salesmen, who solicited his business. Respondent maintained that these two salesmen were agents and representatives of appellant. Respondent also asserted in his answer that the lease was of no force and effect because the leased equipment was defective, thereby breaching the implied warranties of fitness and merchantability which accompanied the delivery of the equipment. Respondent counterclaimed for compensatory and punitive damages which he alleged he suffered as a result of appellant's action.

The trial court rejected appellant's claim for damages resulting from the alleged breach by respondent of the lease agreement. It found that the car washing unit leased by appellant to respondent was defective in design and manufacture; was not as represented nor up to the standards as represented so that the defects were sufficient to entitle respondent to relief as against the manufacturer, Auto Laundry Manufacturing Co. However, it did not find that the representations made by the agents of the manufacturer were binding upon appellant so as to hold it liable under an express warranty theory. Rather it held appellant liable as a lessor under a theory of breach of implied warranties in the nature of fitness. The Court therefore rescinded the lease agreement, relieving respondent of further liability under the lease. It did, however, allow appellant to retain the past rentals paid to it as the value of the use of the defective equipment while in respondent's possession, and ordered that the equipment be returned to appellant. Respondent's counterclaim for damages was denied. The appellant appeals from the trial court's judgment.

Appellant contends that it is unsettled in Idaho whether the lease of personal property has the same legal effect with respect to implied warranties as does a sale of

goods. Appellant concedes that there is authority in other jurisdictions to that effect, but maintains that even if this be the rule of law in this state, the trial court committed reversible error when it concluded that under the facts of this case there existed either an implied warranty of fitness for a particular purpose or an implied warranty of merchantability. In the alternative, appellant argues that any warranties which may have been applicable were effectively disclaimed by it.

■ Before answering appellant's contentions, we must first determine whether the trial court was correct in applying warranty doctrine to a lease transaction. In *Transamerica Leasing Corporation v. Van's Realty Co.*,[1] this Court left open the question whether or not the provisions of the Uniform Sales Act dealing with implied warranties which were then in force in this state, should be applied to lease transactions as well as to sales. In the eight years which have elapsed since that opinion was released, many courts have decided this issue.[2] Articles appearing in legal periodicals have addressed themselves to this issue.[3] Upon the basis of these decisions and analysis we are persuaded after a careful review of the aforementioned authorities that the better rule of law and the weight of authority is in the direction of extending by analogy the implied warranty provisions of the Uniform Commercial Code,[4] (hereinafter Code) which superceded the Uniform Sales Act in Idaho in 1968 to the area of lease transactions *under appropriate circumstances.*

■ It is of course true that Article 2 of the Code applies expressly to sales. This does not mean however that the implied warranty provisions found in Article 2 should not be applied by analogy to lease transactions. In one of the earliest but most frequently referred to articles on this subject,[5] Professor Farnsworth of Columbia Law School argued persuasively for extending by analogy to sales law, the application of implied warranties to non-sales cases.

"To say that a warranty is implied in a sale is not to say that none is implied if there is no sale. Implied warranties of the quality of goods are today firmly entrenched in sales law and their growth has been paralleled by that of similar warranties where goods have been supplied under conditions not amounting to a sale."

The author further noted:

"The preceding discussion indicates that there is respectable authority for the extension of implied warranties to non-sales cases, in spite of a tendency to overlook the possibility. In borderline cases reasoning by analogy to sales law should not be merely a technique of last resort to be used only where the facts will not support the finding of a sale. It is preferable to categorization of the contract as one of sale and direct application of the sales statute. It has five advantages.

The first is greater ease of adjusting legal rules to altered social conditions. If a new duty is to be imposed, it is awkward and misleading for a court to explain that what yesterday was not a sale, is today a sale. . . .

The second is that it avoids the application of sales rules that have no place in a transaction which is comparable to

---

1. 91 Idaho 510, 518, 427 P.2d 284, 292, ftn. 9 (1967).

2. *See* cases collected in 48 A.L.R.3d 668 (1973).

3. *See* Farnsworth, Implied Warranties of Quality in Non-Sales Cases, 57 Columbia L. Rev. 653 (1957); Miller, A "Sale of Goods" as a Prerequisite For Warranty Protection,

24 Business Lawyer 847 (1969); Murray, Under the Spreading Analogy of Article 2 of the Uniform Commercial Code, 39 Fordham L.Rev. 447 (1971).

4. Idaho Code § 28–1–101 *et seq.*

5. Implied Warranties of Quality in Non-Sales Cases, 57 Columbia L.Rev. 653 (1957), *supra* n. 3.

a sale only in respect to the supplier's *obligation as to the quality of his goods.*

· · ·

A third advantage to reasoning by analogy is that it can be used to extend implied warranties to many transactions which could not be defined as sales but which are so like other cases where warranties are implied that they should be treated similarly. · · ·

The fourth advantage is, in a sense, the reverse of the third. Not only is it easier to extend warranties to appropriate cases, but it is also easier to avoid extending them to similar cases which are merely homologous rather than analogous. · · ·

The fifth advantage is that reasoning by analogy lays bare the real reasons for implying a warranty, reasons which are only too easily obscured if the ultimate decision is to rest upon the denomination of the transaction." [6]

We believe that the warranty provisions of Article 2 besides being statutes concerning sales must also be considered statements of public policy which embody the foremost modern legal thought concerning commercial transactions including leases.

Our decision to extend the implied warranty provisions of the Code to lease transactions is in conformity with the liberal spirit of the Code. Section 1–102 of the Code sets forth guidelines for its interpretation:

"§ 1–102. Purposes—Rules of construction—Variation by agreement.

(1) This act shall be liberally construed and applied to promote its underlying purposes and policies.

(2) Underlying purposes and policies of this act are

(a) to simplify, clarify and modernize the law governing commercial transactions;

(b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties;

(c) to make uniform the law among the various jurisdictions."

The extension of warranty protection to leases of chattels was calculated by the drafters of the Code when they noted in an official comment to § 2–313:

"Although this section is limited in its scope and direct purpose to warranties made by the seller to the buyer as part of a contract for sale, *the warranty sections of this Article are not designed in any way to disturb those lines of case law growth which have recognized that warranties need not be confined either to sales contracts or to the direct parties to such a contract. They may arise in other appropriate circumstances such as in the case of bailments for hire, . . . .*" (Emphasis added) [7]

■ In ruling that the implied warranty doctrine applies by analogy to lease transactions, we are not saying that the implied warranty of fitness for a particular purpose (I.C. § 28–2–315) or the implied warranty of merchantability (I.C. § 28–2–314) will arise in all lease transactions as a matter of law. Rather, what we are saying is that the implied warranties of fitness for a particular purpose or merchantability will be imposed in lease transactions when there are present those factors which justify the imposition of either of these warranties in the seller—buyer situation. Thus, before an implied warranty for a particular purpose will be imposed upon a lessor, the lessee must demonstrate that the requirements set forth in I.C. § 28–2–315 have been satisfied. Similarly, before an implied warranty of merchantability will be imposed upon a lessor, the lessee has the burden of showing that the requirements set forth in I.C. § 28–2–314 have been met. Our ruling does not restrict the lessor from making use of the right to disclaim warranties as permitted under I.C. § 28–2–316. We will now

6. *Id.* at 667–669.

7. Uniform Commercial Code § 2–313, Official Comment 2.

proceed to review the trial court's decision within this framework of analysis.

I.C. § 28–2–315 sets forth the following definition of an implied warranty of fitness for a particular purpose in a sales transaction.

"§ 28–2–315. *Implied warranty—Fitness for particular purpose.*—Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

By analogy in a lease transaction, in order for such an implied warranty to arise it must be shown that: (1) the lessor was made aware of the lessee's need, (2) that the lessor recommended a product, and (3) that the lessee leased the product as recommended.[8]

In the instant case, the record indicates that while appellant lessor may have been aware of respondent lessee's need, it made no suggestion or recommendation as to a choice of car wash system to meet this need. Furthermore there is no evidence that respondent made his selection on any basis other than his own inspection of the manufacturer's literature describing the equipment and his impressions of the equipment based upon the statements made by the manufacturer's salesmen which the trial court correctly found did not bind appellant lessor. This being the case, we conclude that no implied warranty of fitness for a particular purpose existed.

Turning our inquiry next to the question of whether appellant impliedly warranted that the car wash system would be of merchantable quality, we conclude that no such implied warranty existed in the instant case. I.C. § 28–2–314 sets forth in pertinent part the following definition of an implied warranty of merchantability in a sales transaction:

"§ 28–2–314. *Implied warranty—Merchantability—Usage of trade.*—(1) Unless excluded or modified (section 28–2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2) Goods to be merchantable must be at least such as

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair average quality within the description; and

(c) are fit for the ordinary purposes for which such goods are used; and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

In a lease transaction, in order for such an implied warranty of merchantability to exist it must be shown that the lessor is a "merchant" with respect to the goods which he leases. I.C. § 28–2–104 defines "merchant" as:

"§ 28–2–104. Definitions—'Merchant'—(1) 'Merchant' means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or

---

8. *See Robinson v. Williamsen Idaho Equipment Company*, 94 Idaho 819, 828, 498 P.2d 1292, 1301 (1972).

skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill."

The official comment following this section notes:

"On the other hand, in Section 2–314 on the warranty of merchantability, such warranty is implied only 'if the seller is a merchant with respect to goods of that kind.' Obviously this qualification restricts the implied warranty to a much smaller group than everyone who is engaged in business and requires a professional status as to particular kinds of goods." [9]

■ It is true that prior to the execution of the lease in issue, appellant handled between forty to fifty transactions over a period of six to eight months, concerning the same Budg-O-Matic Car Wash System that is the subject of this dispute. However, this in our mind does not make All-States Leasing a "merchant" for purposes of the Code. The record discloses that appellant does not build, manufacture or sell any equipment or machines of any kind, but rather is in the business of purchasing or financing the purchase of equipment specifically selected and specified by an approved lessee. Mr. Lorenz, the Chairman of the Board of Directors and Vice President of appellant company testified:

Q. Now, what business—what is the business nature of All-States Leasing Company?

A. We are a capital equipment lessor. We provide equipment to people who make application to use for a lease, if we grant it, we buy the equipment that they specify from the people that they want us to buy it from and we lease it to them.

Q. Does All-States Leasing Company manufacture any kind of equipment?

A. No.

Q. Does All-States Leasing Company broker or distribute any kind of equipment?

A. No.

Q. Do you distribute any kind of merchandise at all?

A. None.

Q. Do you manufacture any kind of merchandise?

A. None.

Q. In other words, your business or All-States Leasing Company is strictly a company that leases or buys equipment that people specify and, then, lease that to them?

A. That's correct.

■ A case directly on point is *Holmes Packaging Machinery Corp. v. Bingham* [10] where the California Court of Appeals in a situation factually similar to the case at hand reasoned:

"In the instant case the record is devoid of evidence showing that Holmes dealt in goods of the kind which Bingham leased from it. To the contrary, the undisputed evidence reveals that prior to execution of the subject lease agreements no employee of Holmes had knowledge of Dulasur's equipment or had ever inspected such equipment. Accordingly the conclusion is inescapable that Holmes did not deal in goods of this kind so as to give rise to an implied warranty on the part of Holmes that the trailers and vulcanizing equipment be of merchantable quality."

Finally, as one law journalist has noted:

"Section 2–314 presents several obstacles to the imposition of liability on the finance lessor. First, the implied warranty of merchantability applies only to 'merchants.' The Code defines a merchant as one who deals in goods of the kind, or holds **himself** out as having

---

9.  Uniform Commercial Code, § 2–104, Official Comment 2.

10.  252 Cal.App.2d 862, 60 Cal.Rptr. 769, 777 (1967).

knowledge peculiar to the goods, involved in the transaction. Since the finance lessor neither deals in goods of the kind being leased nor holds himself out as knowledgeable in the field, the finance lessor does not fit the Code definition of a merchant. Hence, it would appear at the outset that the UCC's implied warranty of merchantability cannot be applied by analogy to the finance lessor." [11]

In light of our conclusion that appellant was a finance lessor and not a merchant for purposes of I.C. § 28–2–314, it is unnecessary to pass upon the validity of the disclaimer clause, as it has no bearing on the merits of this appeal.

We do not have to decide whether respondent would have a cause of action against the manufacturer, as the manufacturer was not joined as a party to this action.

Judgment *reversed*.

Costs to appellant.

DONALDSON and BAKES, JJ., concur.

SHEPARD, Justice (dissenting).

I disagree with that portion of the majority opinion that holds that the lessor is not a "merchant." I cannot agree that the appellant who purchased and thereafter leased large numbers of car wash systems was not "a person who deals in goods of the kind." Although the appellant here did not build or manufacture such equipment, neither do most retailers. The sole distinction in this case is that appellant, being a lessor rather than a vendor, retained title to the equipment. The majority's purported change in rule permitting a lessor, in some circumstances, to be held to an implied warranty of merchantability is in reality no change at all. If a person must "sell" and divest himself of title to become a "merchant" and thus subject himself to implied warranty liability a lessor can nev-

er be subjected to such liability on implied warranty.

SCOGGIN, District Judge (retired), concurs in dissent.

11. Comment, Finance Lessor's Liability for Personal Injuries, Univ. of Ill. Law Forum, Vol. 1, 154, 158 (1974).