## PATRIOT GENERAL LIFE INSURANCE COMPANY *vs.* CFC INVESTMENT COMPANY.

Middlesex.   March 12, 1981. — May 26, 1981.

Present: HALE, C.J., BROWN, & KASS, JJ.

*Contract*, Equipment lease, Performance and breach, Joint venture.

A lessor of a computer equipment package was not liable to the lessee for the malfunction of the equipment where the lessor was merely a finance-lessor which had arranged to purchase the package for the purpose of leasing it to the lessee and where the equipment lease contained an express disclaimer of liability for the malfunctioning of the equipment. [860-863]

Where a lessee failed to avail itself of the termination mechanism under an equipment lease, which permitted termination after sixty days' written notice and payment of seventy percent of the balance of lease payments, but elected to be in breach of the lease, it was correct to find damages on the basis of the entire unpaid balance. [863]

CIVIL ACTION commenced in the Superior Court on August 23, 1977.

The case was heard by *Mulkern*, J.

*Roberta L. Paris* for the plaintiff.

*Richmond T. Edes* for the defendant.

KASS, J.   When computer hardware and software supplied to the plaintiff, Patriot General Life Insurance Company (Patriot), by Asyst, Inc. (Asyst), no longer functioned, Patriot suspended monthly payments to the equipment lessor, CFC Investment Company (CFC).   On the basis of the text of the equipment lease, as well as the factual circumstances, we hold that the equipment lessor is not liable for the malfunction of the computer equipment package, and that the equipment lessee is liable for the balance of payments due under the equipment lease.

Asyst first approached Patriot in February, 1973, with a proposition for a package of computer hardware (i.e., elec-

tronic equipment, printers, specialized typewriter, specialized desk enclosure) and software (i.e., a specialized computer language and computer programs) designed to produce sales illustrations and sales proposals with which to woo prospective customers for life insurance policies. Patriot was interested and negotiations followed. Prophetically, in view of what later transpired, Patriot evinced concern about how it could use the Asyst program should Asyst go out of business. Asyst met this concern with a letter of May 18, 1973, in which it agreed that, "Asyst will initiate procedures to place in trust source, object and documentation information so that Patriot General could continue to maintain and service its system in the event Asyst . . . should discontinue operations." It is not unfair to remark that the extract just quoted appears to be written in neither English nor COMAT, the computer language which Asyst had devised. With the help of testimony taken at trial, we understand that Asyst proposed to place the key to its language, COMAT, and programs devised for Patriot in knowledgeable, but not piratical, hands which would use the material only in the event Asyst vanished from the field. Unless its user talked COMAT to the computer, the computer would not talk sense to Patriot.

On June 11, 1973, Patriot and Asyst signed an agreement describing what Asyst would furnish to Patriot, and the business terms of the deal. The agreement described a purchase price of $35,823 for the package but indicated an intent by Patriot to use an equipment lease "to pay Supplier [Asyst] for use of Equipment." Asyst warranted that "the hardware . . . will be operational at [the] time of installation and fit for the purpose of running the software."

Asyst arranged that CFC would buy the computer package and lease it to Patriot. As of November 29, 1973, CFC made a lease of the equipment to Patriot for five years at a monthly rent of $763. The equipment lease contained an express provision that, "Lessor shall have no liability to Lessee in the event any supplier, manufacturer or one or more others fail[s] to perform any obligations at any time due to Lessor and/or Lessee." Immediately above the sig-

nature block of the lease there also appeared, typed entirely in capital letters for emphasis, a disclaimer of warranties of any kind by the lessor of "the condition of the equipment, its merchantability, [or] the fitness of the equipment for a particular purpose," and the reservation to the lessee of any rights it might have against the supplier of the equipment.

A letter to Patriot dated May 7, 1976, made the unsettling announcement that "Asyst is undergoing reorganization," service on the Asyst computer packages had been discontinued, and would be resumed following "reorganization" and the formation of a new corporation. Nothing in fact happened and the computer system which Patriot had purchased became mute and useless. Patriot notified CFC in December, 1976, that it was terminating the lease and would ship back the equipment. After Patriot returned the equipment the next month (January, 1977), CFC billed Patriot $11,552, an amount which was seventy percent of the remaining lease payments.[1]

Patriot refused to make any further payments and, instead, filed a complaint for a declaratory judgment, to which CFC responded with an answer and a counterclaim. After trial without a jury, a judge of the Superior Court determined that Patriot was liable to CFC under the equipment lease, found the damages and entered judgment for CFC in the amount of $17,116.[2]

Patriot has argued that its agreement with Asyst and the equipment lease with CFC are so intertwined as to constitute an indivisible contract, that Asyst and CFC were

---

[1] Patriot, CFC and Asyst had signed a document which became part of both the agreement of June 11, 1973, between Asyst and Patriot, and the equipment lease between CFC and Patriot. That document provided that if Patriot terminated the lease it would pay seventy percent of the total of the monthly payments remaining at the time of termination.

[2] The judge calculated the damages as follows: the aggregate of the balance of monthly payments under the lease term, $16,023, plus $3,204 for attorneys' fees (computed in accordance with par. VIII of the equipment lease), less the amount for which CFC sold the hardware, $2,111.

joint venturers and that, therefore, Asyst's failure excused Patriot from performance of its obligation under the equipment lease.

We have had occasion recently in *Eastern Elec. Co.* v. *Taylor Woodrow Blitman Constr. Corp., ante* 192, 196-199 (1981), to review the cases in Massachusetts, and some of the literature, concerning joint ventures. The disparate roles which Asyst and CFC played, the former as supplier of materials and services, the latter as financier, do not suggest a joint venture. There was no sharing in profits, no joint interest in particular assets, and no joint control of performance. *Air Technology Corp.* v. *General Elec. Co.*, 347 Mass. 613, 625 (1964). See *Berwin* v. *Cable*, 313 Mass. 431, 435 (1943); *Kleinschmidt* v. *United States*, 146 F.Supp. 253, 256 (D. Mass. 1956). There was no pooling of proceeds received from Patriot for distribution to Asyst and CFC should there be any net profits. Rather Asyst and CFC each received their respective payments from Patriot pursuant to the agreement which each had with Patriot. Indeed, insofar as there was a profit to be made on the sale of the computer package, Asyst earned it by selling the goods to CFC so that CFC, in turn, could lease the package to Patriot.

Tax and accounting considerations have caused a considerable burgeoning in the volume of equipment leasing. Coogan, Leases of Equipment and Some Other Unconventional Security Devices: An Analysis of UCC Section 1-201(37) and Article 9, 1973 Duke L. Rev. 909. Reisman, Drafting and Negotiating the Equipment Lease, in Equipment Leasing-Leveraged Leasing 1, 4-7 (Fritch & Reisman ed. 1977). Commentators have categorized equipment lessors as merchant-lessors, who deal in goods and hold themselves out as having specialized knowledge about the design, operation and repair of the chattel leased,[3] and finance-lessors, whose service is to provide funds and who

---

[3] An example of the merchant-lessor is a manufacturer of an office copier which, without an intermediary, lets such a machine and under-

are not merchants.[4] Carlin, Product Liability for the Equipment Lessor? Merchant-Lessor Versus Finance-Lessor, in Equipment Leasing-Leveraged Leasing 565, 566 (Fritch & Reisman ed. 1977). In the instant case, Asyst designed the computer package and undertook to service it; CFC provided money only and disclaimed any responsibility for the working of the product. It is apparent to us that CFC's status was that of a finance-lessor.[5] See *Holmes Packaging Mach. Corp.* v. *Bingham*, 252 Cal. App. 2d 862, 873-874 (1967); *All-States Leasing Co.* v. *Ochs*, 42 Or. App. 319, 335-336 (1979).

In arguing the indivisibility of the sales contract and the equipment lease, Patriot stresses: (1) references in the equipment lease to the role of Asyst in servicing the equipment; (2) the appending to the lease of the description of the equipment which appeared in the agreement between

---

takes to service it. See by the way of an analogy the definition of "merchant" in G. L. c. 106, § 2-104(1).

[4] An example of the finance-lessor is a bank which, at the request of a customer who wants a piece of equipment, buys the equipment and leases it to the customer. Typically, the rent over the life of the lease amortizes the lessor's cost of acquiring the equipment and provides the lessor with an additional sum substantially equal to the amount of the interest the customer would have paid had the customer himself borrowed the money needed to buy the equipment.

[5] In view of Patriot's lack of reliance upon CFC for any technical judgment, which, indeed, CFC had no capacity to make, there is difficulty in holding CFC to any warranty for the merchantability of the computer package. See by analogy G. L. c. 106, §§ 2-314(1) & 2-315. Nor has Patriot claimed a breach of warranty; rather it has claimed a failure of consideration. Conspicuous disclaimers, however, of the kind employed by CFC in the equipment lease, have served as the basis for decisions enabling equipment lessors to collect lease payments notwithstanding the failure of the leased product to perform. Those decisions have been based on § 2-316(2) of the Uniform Commercial Code (see G. L. c. 106, § 2-316[2]). See *Glenn Dick Equip. Co.* v. *Galey Constr., Inc.*, 97 Idaho 216 (1975); *Todd Equip. Leasing Co.* v. *Milligan*, 395 A.2d 818, 820-821 (Me. 1978); *Bill Stremmel Motors, Inc.* v. *IDS Leasing Corp.*, 89 Nev. 414, 416 (1973); *Cinbar Engr. Co.* v. *Delta Leasing & Inv. Corp.*, 404 S.W.2d 626, 630-631 (Tex. Ct. App. 1966). Such disclaimer clauses are common and not unconscionable. *Bakal* v. *Burroughs Corp.*, 74 Misc.2d 202, 205 (N.Y. Sup. Ct. 1972).

Patriot and Asyst; (3) that all three parties signed an "exhibit" which gave Patriot a cancellation privilege (of the lease and the agreement) upon sixty days' notice, return of the equipment, and payment of seventy percent of the balance of the lease payments; and (4) that CFC and Asyst acted together on approximately eleven similar arrangements. That the equipment lease would incorporate property descriptions and take into account aspects of the underlying deal between Asyst and Patriot is hardly to be wondered at. The same drafting device appears in other forms of financing paper such as construction mortgages. As to the fact that CFC and Patriot often worked in tandem, it is scarcely uncommon that a vendor of real or personal property recommends a source of financing. See *All-States Leasing Co.* v. *Bass*, 96 Idaho 873, 875 (1975) (where lessor had purchased equipment from manufacturer and then leased it to third persons on some forty occasions); *All-States Leasing Co.* v. *Ochs*, 42 Or. App. at 332-333 (lessee selected equipment and asked lessor to buy it from the manufacturer and this did not establish agency relationship between manufacturer and lessor).

When the commercial context has been, as here, a financing lease,[6] the weight of authority is that the consideration which flows from the financing lessor is money, not a functioning product. Accordingly a breach by the supplier of the equipment does not excuse the lessee from making lease

---

[6] We need not decide whether the lease in the instant case is a "pure" lease or a security instrument. It has indicia of the latter, i.e.: aggregate rent over the lease term approximately 28% in excess of the cost of the equipment; a much reduced annual rent after the initial term; a relatively short life for the equipment in view of the rapid changes in computer technology. It lacks, however, the tell-tale indicia described in G. L. c. 106, § 1-201(37)(b). While an option to terminate a lease suggests that the transaction in this case is not a sale, the fact that exercise of the option requires seventy percent of the balance of the rent to be paid looks to a secured transaction as the underlying reality. The record in the instant case, in all events, is inadequate on facts such as the residual value of the equipment or whether CFC filed a Uniform Commercial Code financing statement. See generally Coogan, Leases of Equipment, 1973 Duke L. Rev. 909.

payments to the finance-lessor, unless the equipment lease otherwise provides. Where, as in many lease documents with a finance-lessor (and in the instant case), there is an express disclaimer of liability for malfunctioning equipment, the position of the finance-lessor is that much stronger. See *Holmes Packaging Mach. Corp.* v. *Bingham*, 252 Cal. App. 2d at 873-874, 876; *All-States Leasing Co.* v. *Bass*, 96 Idaho at 878-880; *Bill Stremmel Motors* v. *IDS Leasing Corp.*, 89 Nev. 414, 417-419 (1973); *All-States Leasing Co.* v. *Ochs*, 42 Or. at 335-336; *U.S. Leasing Corp.* v. *Stephenson Equip., Inc.*, 230 Pa. Super. Ct. 181, 182-183 (1974). Cf. *Federal Leasing Consultants, Inc.* v. *Mitchell Lipsett Co.*, 85 Cal. App. 3d Supp. 44, 48-49 (1978).[7]

We find no merit in Patriot's argument that Asyst assigned its position to CFC and that, therefore, the latter is liable for Asyst's undertaking to produce a product which worked. Nothing in the record suggests CFC at any time altered its financing position.

Since Patriot never availed itself of the termination mechanism available under the equipment lease (sixty days' written notice and payment of seventy percent of the balance of the lease payments), but elected, instead, to be in breach of the lease, it was correct to find damages, as the trial judge did, on the basis of the entire unpaid balance, plus counsel fees, and less proceeds of the sale of the equipment.

*Judgment affirmed.*

---

[7] In the cases cited, all but one of the courts also analyzed the equipment leases before them in light of the Uniform Commercial Code, sometimes without explanation, e.g., *Bill Stremmel Motors* v. *IDS Leasing Corp.*, 89 Nev. at 416 & 418. Other courts applied Code principles on the widely accepted theory that Article 2 of the Code should be applicable not only to sales, but to analogous commercial transactions such as leases of personal property. In the finance-lessor context the courts find no implied warranty of merchantability because the lessor is not a merchant (G. L. c. 106, §§ 2-104[1], 2-314[1]), and because the lessee has not relied upon the lessor's skill or judgment to select or furnish the leased equipment (G. L. c. 106, § 2-315). See *Holmes Packaging Mach. Corp.* v. *Bingham*, 252 Cal. App. at 873-875; *All-States Leasing Co.* v. *Ochs*, 42 Or. App. at 335-336. See generally Annot., Application of Warranty Provisions of Uniform Commercial Code to Bailments, 48 A.L.R.3d 668 (1973).