No. 36,816

M. A. Schoonover, *Appellant*, v. Igleheart Brothers, Incorporated, *Appellee.*

(186 P. 2d 109)

Fred J. Evans, judge. Opinion filed November 8, 1947.

*Harry K. Allen,* of Topeka, argued the cause, and *Robert S. Field,* of Syracuse, and *L. M. Ascough,* of Topeka, were with him on the briefs for the appellant.

*Donald C. Martindell,* of Hutchinson, argued the cause, and *William D. P. Carey,. Wesley E. Brown, Edwin B. Brabets,* all of Hutchinson, and *Mark C. Candee,* of New York, N. Y., were with him on the briefs for the appellee.

The opinion of the court was delivered by

Hoch, J.: This was an action by the grower of grain to recover from the prospective buyer, under a written contract, for loss resulting from damage to the unharvested crop by a wind and rain storm. The defendant demurred to plaintiff's fourth amended petition on the ground that it did not state a cause of action. The demurrer was sustained and the plaintiff appeals. Appellant's primary contention is that the legal relation between the parties under the contract was that of bailor and bailee, and that the prospective "buyer," being a bailor, was owner of the growing crop and must therefore suffer the loss.

It will suffice to summarize pertinent allegations of the petition, the averments of fact being admitted by the demurrer.

The appellant Schoonover and the appellee Igleheart Brothers, a

corporation, entered into a written contract on May 11, 1944, the text of which will be later incorporated herein. By the terms of this contract, appellant, who was engaged in farming in Hamilton county, agreed to grow waxy sorghum upon 180 acres of land from seed furnished free by appellee. He agreed to harvest and thresh the crop promptly upon maturity and to make delivery as provided in the contract. The defendant (appellee here) agreed that he would buy the entire crop of waxy sorghum which graded No. 2 or better, and make payment upon the date of delivery or upon plaintiff's demand at a later date as specified, at the "Syracuse Elevator." Prior to maturity of the crop, an agent of the appellee directed that delivery be made to the elevator of the Gano Grain Company in Syracuse. On or about November 15, 1944, the crop was matured and ready for harvesting, and appellant began the harvesting and delivery of the grain on that date. On the first day of harvest, plaintiff harvested approximately three and one-half acres which produced 218 bushels and 52 pounds of grain which he loaded upon a truck and delivered to the Gano elevator. An employee of the Gano company in charge of the elevator refused to receive this truckload of grain for the reason stated that there were no cars in which to ship it and no room was then available for storage. Thereafter, for eight successive days excepting Sunday, appellant tendered the grain to the Gano elevator and each time the grain was refused for the reason above stated; but on November 24 the truckload was accepted and paid for. The entire crop was ripe and ready for harvest on November 15, 1944, "and in the ordinary course of such operations would have been harvested and delivered in not more than six days" if the Gano company had been willing to receive it. During the period of eight days subsequent to November 15, weather conditions were favorable and appellant would have proceeded with the harvesting of the grain without interruption until completed if it had not been for the refusal of the Gano company to accept it. On November 24, a severe storm damaged the unharvested grain, with the result that appellant was thereafter able to harvest only 1,646 bushels which was accepted and paid for.

It was further alleged in the petition that "if the defendant herein had received the crop of grain so produced by plaintiff at the time the same was ready to harvest and would have been harvested but for the failure and refusal of said defendant to receive the same,

there would have been a total of 6,800 bushels of waxy sorghum grain harvested, of the required quality as stated in said contract, and said grain would have been delivered to the defendant by the plaintiff as in said contract provided." Deducting from the 6,800 bushels which appellant alleged would have been harvested prior to November 24, the amount of grain which was delivered and paid for, appellant alleged a loss amounting to 4,935 bushels which, computed "at the price of said grain at the time when the same should have been delivered" represented an alleged loss to appellant of $2,999, for which amount he asked recovery.

The contract involved was as follows:

"GROWER'S CONTRACT

Date May 11, 1944.

M. A. Schoonover     Syracuse, Ks.
(Name of Grower)     (Address)
County of Hamilton     State of Kansas

hereinafter called 'seller,' *has agreed to sell,* and IGLEHEART BROTHERS, INCORPORATED, hereinafter called 'Buyer,' *has agreed to buy,* for delivery during this year's harvest season, *the crop* or crops of waxy sorghum specified below, to be grown by seller upon the following described lands in the County of Hamilton, State of Kansas, to wit:

(Description of Land)

on the following basis, to wit:

*Buyer agrees:*

1. To furnish 540 pounds of waxy sorghum seed to the seller without cost.
2. *To purchase* for cash the entire *waxy sorghum grain crop produced by seller, grading No. 2 or better,* exclusively from the seed furnished as herein provided, at a premium of thirty cents per hundredweight above the local grain sorghum market, said local market to be based on Kansas City quotation, less freight, basis No. 2 grade or better, delivered f. o. b. Syracuse elevator.
3. *To purchase* on the above described basis *upon the day of delivery* at harvest time or upon seller's call at any date thereafter prior to March 1st next following. If seller does not call prior to March 1, 1945, the price shall be fixed as of that date. In accordance with regulations and common practice concerning this type of transaction, *Buyer* will deduct storage charges of 1/30 cent per bushel per day from the date of delivery to the call date, or said March 1st as the case may be.

*Seller agrees:*

1. To grow 180 acres of waxy sorghum from the above seed, and to deliver to seller (buyer) the entire crop from the acreage as stipulated above.
2. To plant, cultivate, harvest, thresh, and otherwise handle the crop in a careful manner approved by Buyer.

3. To plant the acreage contracted for herein before June 15th, next·following the date hereof.

4. To keep the crop of grain grown on said acreage separate from all other grains during handling, harvesting, and shipping, it being clearly understood that only waxy sorghum produced from seed as outlined above will be accepted by the Buyer.

5. To *harvest and thresh said grain crop promptly after maturity and to make delivery hereunder promptly.*

6. That he· will not assign this agreement or any rights hereunder without Buyer's prior written consent.

The foregoing constitutes the entire agreement of the parties with respect to the sale by seller to Buyer of the crop(s) covered hereby, and *may be altered or amended only by written memorandum* signed by seller and by an authorized Agent of Buyer.   (Italics supplied.)

/S/   M. A. SCHOONOVER
          (Seller)
IGLEHEART BROTHERS, INCORPORATED
By:  Collier C. Brown
        (Buyer)"

In sustaining the demurrer, the trial court submitted a memorandum opinion in which the provisions of the contract were thoroughly analyzed and the various contentions fully considered. This excellent memorandum of the trial court might well be inserted here in full, but to do so would perhaps unduly extend this opinion.

Before considering appellant's contentions, we note that he treats the contract as one "to grow seed," and that the cases upon which he relies and to which reference will be made later are of that nature. Such contracts — often called "seedsman's contracts" — although somewhat unique in character, are not uncommon. However, we find nothing in the contract, which alone is before us, to indicate that appellee desired the sorghum for seed purposes, and in oral argument counsel for appellee stated—also outside the record—that the sorghum was not to be used for seed purposes but for special use in a manufacturing enterprise in which appellee was engaged and in which waxy sorghum of pure and high quality is required. But in any event the distinction is not determinative here.

Appellant's fundamental contention is that the contract created a bailment relationship, the company which furnished the seed being the bailor and the farmer who was to grow the crop being the bailee. Under this view, not only the seed furnished but the crop later growing or grown from it being treated as the personalty delivered into the bailee's possession, title at all times remained in the company.

Approaching his argument, appellant invokes the general and elementary rule that a contract like other instruments is to be construed, if possible, to carry out the intention of the parties, and that that intention is to be determined from examination of the contract as a whole. It is also true that the question of whether a contract or other transaction constitutes a bailment is to be determined from all the circumstances and from the entire contract. (8 C. J. S. 228.) We are mindful of these principles in construing the contract before us.

There is no occasion here for lengthy discussion of the broad subject of bailments. The term has been variously defined. It is comprehensively defined in 8 C. J. S. 222 as "a delivery of personalty for some particular purpose, or on mere deposit, upon a contract, express or implied, that after the purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions, or kept until he reclaims it, as the case may be." Other definitions frequently given do not materially differ. In appellant's brief are set out many familiar illustrations where it has been held that the transaction constituted a bailment even though material changes were made in the property delivered to the bailee. (18 Ia. Law Rev. 279.) Among the cases of this nature cited is *Arnott and Archer v. K. P. Rly. Co.*, 19 Kan. 95. It was there held that old and worn-out railroad iron which had been delivered by the railway company to a rolling mill to be used by the latter to reroll into new bars or rails with a certain amount of new iron added, remained throughout the process and in its final form the property of the railway company and that the transaction was in the nature of bailment. Many similar illustrations of this sort might be cited, such as the delivery of wheat to be ground into flour and as such to be returned to the bailor, or of leather delivered to be manufactured into leather products and in that form to be returned to the bailor. Appellant cites several cases and some textbook comments in which this theory of bailment has been expanded to cover the so-called "seedsman's contracts." (6 Am. Jur. 161.) Under this theory, the growing and the matured crop maintains identity with the seed from which it grew. This expansion of the doctrine of bailment has not been free from criticism as being farfetched. (See 10 Cal. Law Rev. 360-361.) However, it is not our purpose to enter that discussion here. For present purposes we may assume that a bailment relationship may

result under a standard seedsman's contract. Let us briefly examine, however, the supporting cases cited by appellant.

The cited case of *Ferry & Co. v. Forquer*, 61 Mont. 336, 202 Pac. 193, is made the subject of an annotation in 29 A. L. R. 642. In the annotation (p. 647) it is said that under the ordinary seedsman's contract "the seedsman furnishes the seed and agrees to pay the grower for raising the seed a certain sum per pound or bushel for all seed meeting the requirements of the contract. There is generally a provision in the contract *reserving to the seedsman title to the seed raised.*" (Italics supplied.) The patent purpose of this reservation of title in the seedsman is to prevent sale of the growing or matured crop by the grower who has been hired to produce the crop, or attachment of the crop by creditors of the grower. In the Forquer case the court construed as a bailment a contract under which a grower agreed *"to raise' for you . . . 30 acres Golden Wax beans"* and to properly prepare the soil and plant the seed furnished by the other party in a manner to secure the greatest possible return of seed suitable for seedsman's use and in which the grower agreed that *"the stock seed and seed crop produced from it is, and shall remain your property* except as otherwise stated in this contract. . . . *In case you refuse to accept the crop, its title shall vest in me."* (Italics supplied.) It is clear that under the Forquer contract, the grower was simply performing a service for compensation in growing a crop for the seed company. In the opinion it was said:

"In other words, title was in the plaintiff until it rejected the crop for either of the reasons mentioned, and then, and not until then, should title vest in the defendant. . . . Again, counsel urge that the provision that plaintiff should pay for the crop in any event is at war with the notion that plaintiff was the owner. The fallacy of this argument lies in the assumption that plaintiff was to pay for the crop. The contract does not so provide. The only reference to compensation in the contract is found in the provision for compensation for the services rendered by the defendant, the amount thereof to be computed upon the amount of the crop produced." (p. 342.)

Obviously, the contract differed materially from the one before us.

Appellant cites the case of *D. M. Ferry & Co. v. Smith*, 36 Ida. 67, 209 Pac. 1066, and an editorial comment on the case from 21 Mich. Law Rev. 590. From the comment, we call attention to the following excerpts:

"The defendant Smith leased land to a third party, who covenanted to pay as rent one-half of all crops grown on the land. Subsequently the lessee made an agreement with the plaintiff by which the former contracted to raise a crop

of beans from seed furnished by the company in return for a stipulated compensation per bushel, *the title to seed and crop to remain in the plaintiff until specifically rejected."* (Italics supplied.)

Again it is clear that the case is not persuasive here.

*Bank v. Simmons,* 91 Colo. 160, 13 P. 2d 259, is cited. This case also involved a contract similar to those in the cases just referred to and entirely different in character from the one before us. In every case cited by appellant, and in every seedsman's contract case found in our own research, where the transaction was held to be a bailment, the contract specifically provided that the title to the seed and the crop was to remain in the party furnishing the seed and it was equally clear that the grower was simply performing a service for which he was to be compensated, such compensation being variously computed.

In *Thiel v. Pacific Fruit & Produce Co.,* 51 Ida. 145, 4 P. 2d 356, the court had before it a contract under which T was to deliver to B two sacks of potatoes for each sack furnished by B, from crop raised therefrom, and in considering the case the court discussed at some length its prior decision in *Ferry & Co. v. Smith,* supra. It was held that the contract did not create a bailment, the fact being stressed that it contained no such reservation of title as in the former case.

Appellant appears to assume that if the instant contract did not provide for a present or executed sale, it necessarily follows that it created a bailment relationship with title to the growing crop remaining in the appellee. Such a result does not follow. We do not find the contract ambiguous. We think it is clearly executory in character (17 C. J. S. 326), one party agreeing to produce a crop of sorghum under specified conditions, and to thresh and deliver it promptly, and the other party agreeing to buy the entire crop, if of proper grade, at a premium price upon delivery. Throughout the contract appellant is referred to as the "seller" and appellee as the "buyer"; the appellant *"has agreed to sell"* and the appellee *"has agreed to buy* . . . the crop . . . to be grown by seller"; appellee (the buyer) "agrees *to purchase* . . . the entire waxy sorghum grain crop produced by seller, grading No. 2 or better . . . at a premium of thirty cents per hundredweight above the local grain sorghum market"; also *"to purchase* . . . *upon the day of delivery."* (Italics supplied.)

Appellant quotes at some length from an article by Professor

Williston in 34 Harvard Law Review 744, in which the writer discussed "the possibility of selling something which does not exist," and states that "the metaphysical doctrine of potential possession in the common law has contributed to confusion of thought in the matter." However, as already noted, we are not here dealing with any "doctrine of potential. possession" but with an executory contract to purchase in the future. Professor Williston says:

"The English Sale of Goods Act and the American Uniform Law both abolish by implication the doctrine of potential possession, leaving the question of contracts to sell future crops, and the future young of animals, on the same footing as contract to sell other unspecified or future goods. In a Colorado decision, a seller contracted to sell 'all hay, grade No. 2, or better, grown or growing upon the above described land for season 1916'. The court held that no title passed to the hay prior to its grading and acceptance by the purchaser. Such would be the natural presumption, and if, as may be supposed, grading involved a matter of judgment and opinion, the necessary conclusion; for until the hay was graded the subject matter of the sale would not be identified. The court also held that a mortgage subsequently executed on the whole crop of hay was valid as against the buyer though the mortgagee knew of the prior contract. This also seems sound."

Likewise, in the instant case, title to the crop did not pass "prior to its grading and acceptance by the purchaser." Prior to the sale, title to the growing crop remained in the grower, no provision in the contract providing otherwise.

Inasmuch as appellant rests his appeal solely upon the premise that the contract constituted a bailment, our rejection of that view is sufficient to dispose of the appeal. We may add, however, as pointed out in the memorandum opinion of the trial court, that even if appellee should be considered a bailor, it does not appear from the allegations of the petition that appellant had performed his obligations under the contract. Although he had ample time to harvest the entire crop under good weather conditions prior to the storm, he did not do so and did not deliver it at the time and place required under the contract. We could not say as a matter of law, that the reason asserted for not doing so relieved him of the obligation to harvest the crop during the good days available prior to the date of the storm, or to tender the grain at the designated place of delivery.

One or two incidental questions are raised, but their discussion or determination would in no way modify the conclusions already stated.

The judgment is affirmed.