575 P.2d 481

Leslie W. PETERSON,
Plaintiff-Respondent,

v.

CONIDA WAREHOUSES, INC., a
Connecticut Corporation,
Defendant-Appellant.

No. 12128.

Supreme Court of Idaho.

Feb. 23, 1978.

Daniel A. Slavin, Stephan, Slavin & Eaton, Twin Falls, for defendant-appellant.

Bert Larson, Parry, Robertson, Daly & Larson, Twin Falls, for plaintiff-respondent.

SHEPARD, Chief Justice.

This is an appeal from a judgment following trial entered in favor of plaintiff-respondent Leslie W. Peterson and against Conida Warehouses, Inc., defendant-appellant, for the value of a portion of a bean

crop grown on Peterson property. It was delivered to Conida under the provisions of an agreement between Conida and third-party defendants Grimms who were tenant farmers on the Peterson property. We affirm.

Essentially two questions are presented for decision. The first is whether an earnest money agreement for the purchase of the Peterson farm vested some type of title in the Grimms which validated the transfer of the otherwise landlord's share of the crop of beans to Conida. Also presented is the question of whether in the absence of any land title in the Grimms, they nevertheless were able to transfer title to Peterson's share of the bean crop.

On September 6, 1972, the Grimms and Peterson entered an earnest money agreement contemplating the purchase of the Peterson property. The Grimms made a $4,000 earnest money payment and the total purchase price was agreed as $280,000, but no terms of the payment thereof were set forth. That agreement also made no provision in regard to taxes, rents, insurance, interest, date of possession or broker's commission. Obtention of an FHA loan was clearly contemplated and was a condition of the agreement.

During October or November of 1972, Peterson and Jim Grimm discussed the financing of the agreement which was expected from Farmers Home Administration and since Grimm's lease on other property had expired, it was agreed that Grimm would then take possession of the Peterson property. Grimm did so take possession, did the fall work on the farm and expended certain monies in improvements. During 1973 the Grimms continued to occupy and operate the Peterson farm and some time during April, May or June the Grimms and Peterson, after they determined that the FHA money would not be forthcoming, terminated the earnest money agreement and the $4,000 paid thereon was returned to the Grimms. The Grimms and Peterson then entered into a rental agreement for the Peterson farm wherein the seed and other farm expenses were to be shared on a basis of 60 percent contributed by the Grimms and 40 percent by Peterson. In return therefor, the crops would be shared on the same 60 percent to the Grimms and 40 percent to Peterson.

In the meantime and without the knowledge of Peterson, the Grimms and Conida entered into an agreement whereunder Grimms would receive seed beans which they would plant and the bean crop therefrom would be delivered to Conida at the rate of $10 per hundredweight. At the time of that agreement, Jim Grimm told the Conida field man that he, Grimm, was buying the Peterson property. During that negotiation the Conida representative made no further inquiry regarding the terms of the property acquisition nor did he see the earnest money agreement. There is no indication that the Conida representative made any effort to contact Peterson, make any inquiry regarding the real property transaction or Grimm's authority to sell the crop.

During the middle of September the Grimms harvested and delivered the bean crop to Conida and advised Conida of the Peterson-Grimm 60–40 crop sharing agreement. Peterson did not become aware of the Grimm-Conida agreement until December 1973 when Peterson and the Grimms were settling their account. In January 1974, Conida sent Peterson two checks representing what Conida claimed to be the Peterson interest in the bean crop, i. e., 40 percent at $10 per hundredweight. One check was for "pink" beans and the second for "bonus" beans (small white beans). Peterson cashed the check for the bonus beans, but returned the check for the pink beans to Conida with a request that Conida issue a warehouse receipt for the pink beans. Conida did not issue the requested warehouse receipt and on May 9, 1974, Peterson again wrote Conida requesting that Condia sell the Peterson share of the pink beans at the then current market price and if the market price was less than $50 per hundredweight, Conida was to first consult with Peterson's attorney. Conida did not comply with Peterson's request and did not sell the pink beans.

Peterson brought action to recover the value of his share of the bean crop. Conida answered and filed a third-party complaint against the Grimms for indemnification of whatever loss Conida might suffer in the Peterson action. Following trial, judgment was rendered in favor of Peterson and against Conida for the market value of Peterson's pink beans. The trial court held that Peterson's cashing of the bonus beans check constituted a sale and Peterson's recovery thereon was denied. No appeal was taken from that portion of the judgment and no issue exists on appeal. The trial court further denied Conida's claim against the third-party defendant Grimms for indemnification. Although appeal was taken from that portion of the judgment, it was settled and dismissed.

■ Appellant Conida first argues that by virtue of the execution of the earnest money agreement between Peterson and the Grimms, equitable title to the farm passed to the Grimms and they therefore had the capacity to enter into a binding contract for the disposition of the crops grown thereon. The trial court held to the contrary in its decision on the motion to amend the findings and conclusions. That holding of the trial court is clearly supported by the record. The earnest money agreement itself was so unsettled, ambiguous and devoid of necessary terms and conditions as to be unenforceable and it conferred no rights on the Grimms. *See Matheson v. Harris*, 96 Idaho 759, 536 P.2d 754 (1975); *Luke v. Conrad*, 96 Idaho 221, 526 P.2d 181 (1974); *C. H. Leavell & Co. v. Grafe & Assocs., Inc.*, 90 Idaho 502, 414 P.2d 873 (1966). The trial court held that the Grimms and Peterson entered into the earnest money agreement on a contingency basis, *i. e.*, that if the desired financing for the Grimms was unavailable, the Grimms would occupy the farm on a tenant basis with a share crop arrangement. Since financing did not become available, the Grimms occupied the farm as tenants on a share crop basis. That holding is sustained by the evidence and will not be disturbed.

■ Appellant Conida argues that notwithstanding the landlord-tenant relationship between Grimm and Peterson and the lack of any land title in Grimm, Grimm was nevertheless able to contract with Conida for the disposition of Peterson's share of the bean crop. As recognized by the trial court, such theory is directly contrary to the law of this state as expressed in *Washburn-Wilson Seed Co. v. Alexie*, 54 Idaho 727, 35 P.2d 990 (1934). There, as here, "Appellant relies upon *D. M. Ferry and Co. v. Smith*, 36 Idaho 67, 209 P. 1066, which on the face of it unquestionably and squarely supports its position. The action there being between a landlord basing his claim on a crop share lease, as respondent does here, and the seed company" on a contract declared by the court to be one of the bailment with the lessee. 54 Idaho at 729, 35 P.2d at 990-91. The Court in *Washburn-Wilson* held that *D. M. Ferry & Co., supra,* had been overruled and that under a crop share lease the landlord and tenant are cotenants in the crop and " * * * one tenant in common may not in any way dispose of the share or interest of any other cotenant without such other cotenant's consent * * *." 54 Idaho at 730, 35 P.2d at 991.

In *Washburn-Wilson* a landlord-tenant relationship existed on a crop sharing basis. The tenant contracted with a seed company for the furnishing of seed, with the crop thereon to be delivered to the seed company. A dispute arose between the seed company and the landlord as to the ownership of the landlord's share of the crop as determined by the landlord-tenant agreement. The Court held "Respondent [landlord] herein being a co-owner of any crops to be grown upon his land, his cotenant, the lessee, could made no contract with appellant [seed company] affecting his title to such one-third interest * * *." *Id.*

Hence, we determine that *Washburn-Wilson* is on all fours with the case at bar and is controlling. We decline appellant's invitation to overrule *Washburn-Wilson*. Appellant argues that *Washburn-Wilson* has been overruled or at least modified by *Kent v. Campbell*, 80 Idaho 57, 324 P.2d 398 (1958). Insofar as indicated by the opinion

in *Kent*, no landlord-tenant (cotenant) relationship existed and the dispute there existed between a seed company and growers who admittedly were in privity with the seed company through the execution of seed and crop agreements. Since no problem of privity existed in *Kent v. Campbell, supra,* that Court correctly gave no attention to *Washburn-Wilson* and such case was not even discussed much less overruled.

The decision of the trial court was correct in all respects and is affirmed. Costs to respondents.

McFADDEN and DONALDSON, JJ., concur.

BAKES, J., concurs in result.

BAKES, Justice, concurring specially:

I do not see how the Court can conclude that *Washburn-Wilson Seed Co. v. Alexie,* 54 Idaho 727, 35 P.2d 990 (1934), is controlling without overruling *Kent v. Campbell,* 80 Idaho 57, 324 P.2d 398 (1958). The theory in *Kent* was that the bailor seed company, by its bailment contract, had retained title to the beans that it provided to the bailee-farmer and to the crops produced from the beans as a result of the bailee's farming efforts. Under this theory, no agreement between the bailee and his landlord for division of the crop grown could in any way take away the bailor-seed company's title. Unless the *Kent* reasoning is modified to accommodate competing claims there is no way that a sharecrop landlord can obtain title to a crop that is the subject of a bailment agreement such as that involved in this case. What the majority has done here is to create such a policy exception to the *Kent* rule in favor of landlords (and perhaps in subsequent litigation other lien claimants) without actually expressly saying so.

In my view, the bailment theory accepted in *Kent* should be rejected by this Court, not merely sidestepped as we have done in this case. I agree with Justice Bistline that it is stretching the concept of bailment beyond its breaking point to assert that one may deliver beans to another to plant them and harvest the crop and still retain title to the crop produced by the planting.

When new value is added to the personal property of one person by the labors of another, the law of accession determines which party has title to the product of the materials and labor. See R. Brown, The Law of Personal Property § 6.1 (3d ed. W. Raushenbush 1975). "According to the famous Digest of the Emperor Justinian, 'If the new object can be reduced to the materials of which it was made, it belongs to the owner of the material; if not, it belongs to the person who made it.' " *Id.* § 6.2 at 50. More recently, courts have looked not only at changes in the character of the property, but also at the proportionate contributions of labor and material to the value of the resultant product. See *id.* at 51.

Applying these tests to the bailment of seeds to a farmer, it is apparent that the seed company should not retain title to the resultant crop. The crop cannot be reduced to the same seeds from which it grew, and it will ordinarily be worth infinitely more than were the seeds. The farmer's land, water, fertilizer and labor produces a product so transformed and so enhanced that title to the resultant crop should belong to the farmer. The seed company, of course, would retain contractual rights against the farmer. However, these rights do not give the seed company any claim to the crop itself, particularly as against the rights of a sharecrop landlord, whose proprietary interest would arise concurrently with that of his farmer-tenant.

BISTLINE, J., concurs.

BISTLINE, Justice, specially concurring.

Both parties have treated the Grimms-Conida contract as a "bailment," both in the trial court and in this Court where we have properly decided the appeal on the theories on which the action was tried. It should be noted, however, that the word "bailment" does not appear in the written agreement. Equally missing are the words "bailee" and "bailor." Nonetheless, Conida purported to contract on the basis that title to all seed

beans and to all the crops which grew from the same remained in Conida, with Grimms to be docked $1.00 per hundredweight for each specific percentage graded below the minimum of a U.S. No. 1.

While I have little trouble in agreeing that this is not a sale, to my mind it does not necessarily follow that it is a bailment. To indulge in the fiction of calling a bailment that which is not a bailment does very little to promote jurisprudence as a science. My vote for affirmance, therefore, should not be construed as implying any conviction that the arrangement between Grimms and Conida was a bailment. Obviously, once those seed beans were planted, it was impossible for the Grimms to return the "bailed goods," which, in my view, is always the right of a bailee. *Industrial Leasing Corp. v. Thomason,* 96 Idaho 574, 532 P.2d 916 (1974).

The tradition of referring to seed contracts as "bailments" appears to have originated in Idaho in the case of *D. M. Ferry & Co. v. Smith,* 36 Idaho 67, 209 P. 1066 (1922). In that case, the Court upheld the seed company's claim, as bailor, to ownership of all the crop in question as against the claim of a landlord who was by written lease entitled to one-half of all crops grown on his land, and who had not participated at all in the lessee-bailee's contract with the seed company. In so concluding, the Idaho Supreme Court relied heavily upon a Montana case, decided just one year earlier, involving the same seed company, *D. M. Ferry & Co. v. Forquer,* 61 Mont. 336, 202 P. 193, 29 A.L.R. 642 (1921). It was the Montana court which first observed such a contract as being one founded in bailment; the Idaho court merely fell into line, without making any independent analysis of the legal status which existed between the lessee and the seed company. The Montana holding was somehow molded out of language found in *Coggs v. Bernard,* 2 Ld. Raym. 909, 92 Eng. Reprint, 107, 5 Eng. Rul. Cas. 247 (1702), wherein, as the Montana court observed,

Chief Justice Holt classified the different kinds of bailments, and, among other things, said: "The fifth sort is when goods or chattels are delivered to be carried or something is to be done about them for a reward to be paid by the person who delivers them to the bailee who is to do the thing about them." *D. M. Ferry & Co. v. Forquer,* 61 Mont. 336, 202 P. at 195.

Even so, the Montana court, in evident realization that it was on tenuous ground in applying 18th century English law of common carriers to Montana seed contracts, quickly added:

> It may be that Chief Justice Holt, in thus expounding the common law, did not have in contemplation a seed contract of the character of the one before us, but it is the malleability of the common law, its adaptability to changed conditions, that is its distinguishing characteristic and greatest virtue, and it may be asserted with confidence that the modern law of bailments finds justification in the rules announced in *Coggs v. Bernard,* in whatever varied form they may be promulgated. *Id.*

In *Washburn-Wilson Seed Co. v. Alexie,* 54 Idaho 727, 35 P.2d 990 (1934), the Court continued to uphold the validity of Idaho's *Ferry Co.* bailment doctrine as still "defining the rights between the seed company and the party contracting with it." The *Ferry Co.* case was overruled only so far as necessary to hold that a landlord is co-owner of any crops to be grown upon his land, and that his cotenant (his lessee), bailment contract or no, can "make no contract with [the seed company] affecting his [the landlord's] title to such one-third interest." [1]

I submit that it is unrealistic to continue to indulge in the fiction that a bean, which is irretrievably planted in the ground, and whose very existence as a bean ceases as it turns into a plant, may be the subject of a bailment, entitling the supplier of the bean

1. This doctrine was derived from the intervening case, *Devereaux Mtg. Co. v. Walker,* 46 Idaho 431, 268 P. 37 (1928).

to claim all the beans produced from that plant. The parties essentially have entered into a joint venture, with the seed company supplying the seed beans, and the grower, here the Grimms, supplying the land in which the beans may be planted, together with all the labor which goes into planting, cultivating, harvesting, and hauling to the warehouse. The Idaho court, in our *Ferry Co.* case, in quoting from the Montana *Ferry Co.* case, came close to the right answer where it spoke of "a share of the net proceeds of the adventure." 36 Idaho at 73, 209 P. at 1067. Here the grower's share was agreed upon at so much per hundredweight, which seems to be what he was to receive for services rendered in the adventure, and not, by any stretch of the imagination, as compensation for storing the beans one inch apart in rows in the ground.