814 P.2d 941

**CLEMENTS FARMS, INC.,**
**Plaintiff–Respondent,**

v.

**BEN FISH & SON, and Paul L.**
**Dompe, Defendants–Appellants.**

**No. 17149.**

Court of Appeals of Idaho.

May 31, 1990.

Petition for Review Granted
Dec. 18, 1990.

Gigray, Miller, Downen, Weston & Paisley, of Caldwell, for defendants-appellants. Donald E. Downen argued.

Eberle, Berlin, Kading, Turnbow & Gillespie, of Boise, for plaintiff-respondent. B. Newal Squyres argued.

BURNETT, Judge.

This appeal arises from a dispute between a farmer and a seed producer. The issues are whether the district court correctly (a) ruled that the Uniform Commercial Code was applicable to this case; (b) found that the seed producer had breached an implied warranty of fitness for a particular purpose under the UCC; (c) determined the extent of the farmer's damages; and (d) awarded attorney fees to the farmer. For reasons explained below, we affirm the judgment of the district court in all respects except the award of attorney fees.

I

The issues are framed by a convoluted sequence of transactions involving the seed producer, the farmer and a seed warehouse. The seed producer is a California enterprise doing business as "Ben Fish and Son." It has developed numerous strains of proprietary lima bean seed to meet various agricultural needs. In order to test its products in differing climates, the seed producer has arranged through seed warehouses to have the beans grown by farm-

ers across the country. In 1985, the seed producer sent one of its bean seed strains, known as GBL 8–78, to Idaho for testing. The seed was stored at Shields Seed Company, a seed warehouse in Nampa. Shields then contracted with the farmer, Clements Farms, Inc., to grow a lima bean seed crop from the seed provided. The contract provided that the farmer would be paid $21.00 per hundredweight when the proper grade of harvested seed crop was delivered to the warehouse.

In the early spring of 1985, before the seed had been planted, the farmer learned that the warehouse was in financial difficulty. Discussions ensued as to whether the warehouse would be able to purchase a harvested crop later in the year. When these discussions proved inconclusive, the farmer communicated with the seed producer in California, exploring the possibility of a direct bilateral agreement that would avoid any risk of a future default by the warehouse. The seed producer's president flew to Idaho and met with the farmer. With the knowledge and consent of the warehouse, the farmer and seed producer signed a new contract, consisting of a form agreement printed on the seed producer's letterhead. This new contract provided that the farmer would grow a crop from "stock seed furnished by [the seed producer]." The farmer agreed to deliver the harvested crop to the seed producer, in care of the Shields warehouse; but if Shields was no longer in business by that time, delivery would be made at another warehouse. The new contract further provided for the farmer to receive from the seed producer the same price for a grown bean crop as the warehouse earlier had agreed to pay.

The new contract was signed on May 29, 1985. On that date, the seed was still unplanted. As the evidence later would show, the GBL 8–78 seed had an unusually slow maturation rate, rendering it more susceptible than most seed strains to crop loss if a frost occurred in the fall. The district court found that this unusual characteristic was not disclosed to the farmer by the seed producer or by the warehouse. Rather, the farmer was simply advised to "get [the bean seed] in the ground as soon as possible." After preparing a field for cultivation, the farmer planted the GBL 8–78 seed in mid-June. The crop ultimately was destroyed by frost before it had fully matured.

The farmer brought this action against the seed producer and the warehouse, seeking reimbursement for money spent attempting to grow the ill-fated crop. For reasons not important here, the warehouse was dismissed from the case. With respect to the seed producer, the farmer asserted a breach of an implied warranty of fitness under the Uniform Commercial Code. The farmer alleged that the seed producer had represented the seed to be capable of maturing into a harvestable crop. Following a bench trial, the farmer received a judgment for compensatory damages and attorney fees. The seed producer appealed.

## II

We now turn to the issues raised by the seed producer. We deal first with issues relating to liability under the Uniform Commercial Code; then we focus on the questions of damages and attorney fees.

### A

█ The seed producer argues that the Uniform Commercial Code should not apply to the farmer's claim because the contract did not provide for a sale of goods to the farmer. If there was any sale, the seed producer contends, it was a prospective sale of the anticipated crop by the farmer to the producer; thus, the producer was never in the position of a seller under the UCC. This argument overlooks the fact that the seed producer referred to itself as the "seller" in the contract it signed with the farmer. In a purported disclaimer of warranties, the contract stated: "Ben Fish & Son warrants to the extent of the purchase price that *seeds sold* are as described on the container within recognized tolerances. *Seller* gives no further warranty, express or implied." (Emphasis supplied.)

More fundamentally, the seed producer's argument disregards the first phase of the

transaction, in which the seed producer furnished goods (the seeds) to the farmer. The question is whether such furnishing of goods in a commercial transaction should be treated as a sale under the UCC. The district court addressed this question obliquely, characterizing the furnishing of goods as a "bailment," to which the UCC could be extended. The seed producer now attacks the "bailment" characterization and argues, in any event, that the UCC does not apply to bailments.

For reasons we will discuss in a moment, we do not think the bailment controversy controls this case. We pause, however, to acknowledge that many reported decisions have characterized seedman's contracts as bailments. *E.g., Washburn–Wilson Seed Co. v. Alexie*, 54 Idaho 727, 35 P.2d 990 (1934); *Smith v. Washburn–Wilson Seed Co.*, 40 Idaho 191, 232 P. 574 (1925); *D.M. Ferry and Co. v. Smith*, 36 Idaho 67, 209 P. 1066 (1922). On the other hand, this characterization has been questioned in some cases. *See Chapman v. Haney Seed Co., Inc.*, 102 Idaho 26, 624 P.2d 408 (1981); *Peterson v. Conida Warehouses, Inc.*, 98 Idaho 883, 575 P.2d 481 (1978) (Bakes, J., and Bistline, J., special concurring opinions). But the real linchpin of the district judge's decision is not his choice of bailment terminology; it is his underlying determination that the UCC and its warranty provisions should apply to the furnishing of goods in the commercial context presented here. We agree.

Article 2 of the UCC applies generally to commercial transactions involving sales of goods. The courts also have applied the Code's provisions by analogy to a variety of transactions other than sales, such as leases, bailments and loans of goods. Annot., *What Constitutes a Transaction, a Contract for Sale, or a Sale within the Scope of UCC Article 2*, 4 A.L.R. 4th 85 (1981 and later supplements). The Idaho Supreme Court has applied the UCC to a lease. *See All–States Leasing Co. v. Bass*, 96 Idaho 873, 538 P.2d 1177 (1975). The Court thereby has expressed its disagreement with decisions in a few other states, where courts have refused to extend Code warranties to non-sale transactions without

express legislative authorization. *See, e.g., R & W Leasing v. Mosher*, 195 Mont. 285, 636 P.2d 832, 835 (1981); *Baker v. Promark Products West, Inc.*, 692 S.W.2d 844, 846 (Tenn.1985). Such narrow decisions have been criticized as violating the intent of the UCC's drafters, who declared in section 1–102 that the Code should "be liberally construed and applied to promote its underlying purposes and policies." *See* Special Project, *Article Two Warranties in Commercial Transactions: An Update*, 72 CORNELL L.REV. 1159 (1987).

In *All–States Leasing*, our Supreme Court said that one purpose of applying UCC warranties by analogy is that "implied warranties can be extended to many transactions which could not be defined as sales but which are so like other cases where warranties are implied that they should be treated similarly." 96 Idaho at 878, 538 P.2d at 1182 (quoting Farnsworth, *Implied Warranties of Quality in Non-Sales Cases*, 57 COLUM.L.REV. 653 (1957)). In another lease case, our Supreme Court noted that "reasoning by analogy does not require us to apply Article 2 in toto ...; rather we need apply only those provisions which are sufficiently analogous." *Glenn Dick Equipment Co. v. Galey Construction, Inc.*, 97 Idaho 216, 222, 541 P.2d 1184, 1190 (1975). The Court continued:

> [W]e will look to the commercial setting in which the problem arises and ... use Article 2 as "a premise for reasoning only when the case involves the same considerations that gave rise to the Code provisions and an analogy is not rebutted by additional antithetical circumstances."

*Id.* at 222, 541 P.2d at 1190 (quoting Note, *The Uniform Commercial Code as a Premise for Judicial Reasoning*, 65 COLUM.L.REV. 880, 888 (1965)).

Here, the furnishing of seed to the farmer closely resembled a sale of goods. The seed producer transferred the seeds, and the farmer received them, for valuable consideration. The fact that the consideration consisted of future services by the farmer, coupled with the seed producer's promise of future payment for a grown crop, does

not defeat the logical application of the UCC to any issue regarding the seeds themselves. Although "title" to the seeds may not have passed from the seed producer to the farmer, our Supreme Court's decisions in the lease cases have made it clear that passage of title is not essential to application of the UCC.

In short, to paraphrase our Supreme Court's language in *Glenn Dick Equipment,* we have examined the commercial setting in which the bean seeds were furnished by the seed producer to the farmer. We believe this case involves the same considerations that gave rise to the Code provisions. We perceive no circumstances antithetical to applying the Code. The UCC analogy fits. Therefore, we uphold the trial judge's ruling that the Code is applicable to this case.

### B

The next question, given the applicability of the UCC, is whether the trial judge correctly determined that the seed producer breached an implied warranty of fitness for a particular purpose under UCC § 2–315, codified in Idaho as I.C. § 28–2–315. The seed producer argues that (1) an implied warranty was not created; (2) even if it was created, it was effectively disclaimed in the contract; and (3) even if it was not effectively disclaimed, there was no actual breach of the warranty. We will address each contention in turn.

### 1

■ In order for a sale to create an implied warranty of fitness for a particular purpose, the seller must have reason to know the buyer's particular purpose; the seller also must have reason to know that the buyer is relying on the seller to furnish appropriate goods; and the buyer must have relied upon the seller's skill or judgment. I.C. § 28–2–315; *All-States Leasing,* 96 Idaho at 879, 538 P.2d at 1183. By analogy, the requirements here would be that the seed producer had reason to know the farmer's particular purpose for the seed; that the seed producer had reason to

know the farmer was relying on the producer to furnish appropriate seed; and that the farmer did, in fact, rely upon the producer's skill or judgment regarding the seed. Each of these criteria frames a question of fact. Accordingly, we employ a clear error standard in reviewing the district court's determination that the warranty requirements have been satisfied. *Martineau v. Walker,* 97 Idaho 246, 542 P.2d 1165 (1975).

■ It is self-evident that the seed producer knew the farmer's purpose for the seed. The farmer sought to grow the seed into a harvestable crop pursuant to a contract with the seed producer. The remaining questions focus on the reliance criteria—whether the producer had reason to know the farmer would rely, and whether the farmer actually did rely, on the producer's judgment in furnishing appropriate seed.

As noted above, GBL 8–78 was a proprietary bean seed. It was developed and owned by the seed producer. The producer knew the bean would not grow everywhere; in fact, the producer was testing the seed in the Idaho climate. GBL 8–78 required a 120–day growing season. The farmer testified that the usual growing season for beans in southwestern Idaho was 90 days. The district court implicitly found that where the seed producer had unique knowledge about the seeds, the farmer necessarily relied—and the producer was deemed to know that the farmer would rely—upon the producer's judgment as to whether the seeds would serve their intended purpose.

It has been argued that both parties, in effect, had unique knowledge—the producer as to the seed's unusual maturation rate, and the farmer as to the ordinary bean-growing time in southwestern Idaho. In our view, however, the ordinary bean-growing season was not information uniquely possessed by the farmer; it was information generally available. In contrast, the characteristics of the GBL 8–78 seed were proprietary information, not generally available. The farmer (Maurice Clements) testified that had he known the GBL 8–78

**214**

seed required a 120–day growing season, he would not have planted it. The record indicates that in order to avoid destruction by frost in the fall, it would have been necessary to plant the seed in mid-May. The contract between the farmer and the seed producer was executed on May 29, yet there was no disclosure to the farmer of the risk associated with planting after that date.

Upon these facts, we find no clear error in the district court's determination that the reliance criteria of UCC § 2–315 were satisfied. We conclude that there was an implied warranty of fitness for a particular purpose.

**2**

We now consider the seed producer's argument that it effectively disclaimed any implied warranty of fitness. Our Supreme Court has stated that the implied warranty of fitness can be disclaimed, but that the courts will "construe strictly language negativing the implication of such a warranty." *Glenn Dick Equipment Co.*, 97 Idaho at 225, 541 P.2d at 1193. Disclaimers must be in writing and conspicuous. I.C. § 28–2–316. A trial court must determine whether the disclaimer is "so written that a reasonable person against whom it is to operate ought to have noticed it." I.C. § 28–1–201(10).

■ In making this determination, the court must examine the entire document, comparing the disclaimer clause to the rest of the document for various relevant factors—location, type size, contrasting type, ink color, vagueness of terms, etc. None of these factors, standing alone, necessarily will determine the validity of a disclaimer clause. They must be weighed collectively. *See, e.g., Lee v. Peterson*, 110 Idaho 601, 604, 716 P.2d 1373, 1376 (Ct. App.1986) (disclaimer found ineffective where language failed to state plainly that no implied warranty existed); *Snake River Equipment Co. v. Christensen*, 107 Idaho 541, 549–50, 691 P.2d 787, 796–97 (Ct.App. 1984) (review denied) ("as is" disclaimer in upper case type on separately signed addendum found conspicuous); *J & W Equip-*

*ment, Inc. v. Weingartner*, 5 Kan.App.2d 466, 618 P.2d 862 (1980) (disclaimer printed in bold upper case letters near signature line found conspicuous); *P.E.A.C.E. Corp. v. Oklahoma Natural Gas Co.*, 568 P.2d 1273 (Okla.1977) (disclaimer in small print on back of document found inconspicuous). Because the weighing of these factors is essentially a fact-finding function, we again apply a clear error standard of review. *Martineau v. Walker, supra.*

■ In the present case, as we have noted, the contract was written on Ben Fish & Son letterhead. Beneath the letterhead, in print smaller than that used elsewhere in the document, appeared the purported disclaimer quoted earlier in this opinion. The trial judge rejected this disclaimer as inconspicuous, noting that "it [was] in fine print under the letterhead at the top of the page" and that it failed to "make it plain that an implied warranty [had] been disclaimed." The disclaimer clause was not printed, so far as the record before us discloses, in a contrasting ink color. Upon these facts we find no clear error in the trial judge's determination that the disclaimer clause was inconspicuous. We therefore uphold the judge's conclusion that the disclaimer was ineffective.

**3**

■ Because the warranty was not disclaimed, the next question is whether it was breached. In an action for breach of an implied warranty, the buyer has a burden of establishing the breach by a preponderance of the evidence. *Dickerson v. Mountain View Equipment Co.*, 109 Idaho 711, 716, 710 P.2d 621, 626 (Ct.App.1985). Whether the seed producer breached its warranty in this case was a question for the trier of fact. *Martineau v. Walker, supra.*

■ The seed producer contends that there was no breach, although its argument—when closely examined—actually seems to be that if a breach occurred, it did not cause the farmer's crop loss. The seed producer maintains that failure of the seeds to produce a crop was due to the

farmer's own error. Specifically, the producer points to the fact that the seeds were at the warehouse, and available for planting, as early as March. The farmer did not plant them until mid-June. The seed producer argues that if the farmer had planted the GBL 8–78 seed by mid-May, he would have obtained a harvestable crop. The difficulty with this argument is that it focuses on a time period when the farmer's contract was with the warehouse, not with the seed producer. Any delay during that period was occasioned by the farmer's legitimate concern over the warehouse's financial condition.

Focusing more particularly on the farmer's transaction with the seed producer, the dispositive fact—as found by the district court—is that the producer signed a new contract directly with the farmer on May 29, even though the producer knew that the seed was not then in the ground. The producer implicitly recommended planting the seed after that date, and the farmer did so. The farmer's actions were consonant with a reasonable belief that the GBL 8–78 seed, like other bean seeds he was planting that year, would have a normal maturation period. Given these circumstances, we perceive no clear error in the trial judge's findings that a breach of warranty occurred and that it caused the farmer's loss.

### C

We now turn to the damage issue. The seed producer attacks the damage award on two fronts. First, the producer contends that the trial court applied an incorrect legal standard in measuring damages. Second, the producer disputes the sufficiency of evidence to support the sum awarded by the trial court. We will discuss these contentions in turn.

### 1

The seed producer argues that the trial court erred by allowing the farmer to claim reimbursement of expenses rather than lost profits, which would require the court to ascertain the difference between the value of the crop actually raised and the crop that would have been raised under normal conditions, less the costs of maturing, harvesting and delivering the crop. *See generally Casey v. Nampa and Meridian Irrigation Dist.*, 85 Idaho 299, 304, 379 P.2d 409, 411 (1963). Our examination of the record, however, reveals that the seed producer failed to raise this issue before the trial court. Although the seed producer vigorously disputed the expenses claimed by the farmer, it never argued below—so far as our record reveals—that the correct measure of damages was lost profits rather than reimbursement of expenses. In effect, the case was tried on the farmer's assertion of a reliance interest, rather than of an expectancy interest, in the seed-growing contract. *See generally Brown v. Yacht Club of Coeur d'Alene, Ltd.*, 111 Idaho 195, 198–99, 722 P.2d 1062, 1065–66 (Ct.App.1986) (discussing these different interests and the recoveries pertinent to each).

An appellant is bound by the issues and theories upon which the case was tried below. Although a judgment may be sustained upon any legal theory, a new theory cannot be employed on appeal to attack the judgment. *Beaupre v. Kingen*, 109 Idaho 610, 710 P.2d 520 (1985); *Heckman Ranches, Inc. v. State*, 99 Idaho 793, 589 P.2d 540 (1979). Because the lost profits theory of damages was not framed below, it is not properly before this Court on appeal. We will not pursue it further.

### 2

The seed producer did effectively preserve its objection to the quantification of damages in light of the evidence presented. Damages for breach of contract need not be proved with mathematical exactitude; they simply must be proven beyond speculation. *Haener v. Ada County Highway Dist.*, 108 Idaho 170, 174, 697 P.2d 1184, 1188 (1985); *Wing v. Hulet*, 106 Idaho 912, 684 P.2d 314 (Ct.App.1984). We will not disturb a judge's measure of damages unless it is clearly erroneous. *Davis v. Gage*, 109 Idaho 1029, 712 P.2d 730 (Ct. App.1985).

Here, the dollar figures and supporting evidence need not be recounted in detail.

It suffices to say that the farmer provided the court with a thorough breakdown of costs, calculated from extensive records, which the trial court accepted. Although the seed producer disputed many of the farmer's figures, the trial court found them to be reasonable. We find no clear error in the trial court's determination, and we will not disturb it.

## D

Finally, the seed producer challenges the trial court's award of attorney fees to the farmer. The court predicated this award upon a provision in I.C. § 12–120(3) which mandates a grant of attorney fees to the prevailing party in "any civil action ... [on] any commercial transaction...." The reference to a "commercial transaction" was added to I.C. § 12–120 on July 1, 1986. We have held, in *Myers v. Vermaas,* 114 Idaho 85, 753 P.2d 296 (Ct.App.1988), that the 1986 version of the statute may not be applied to a case filed prior to the effective date of the amendment. This case was filed in March, 1986. Consequently, the 1986 version of the statute should not have been applied. In fairness to the district judge, we note that he did not have the benefit of *Myers* when he made his ruling in the present case.

Moreover, we do not think the case falls within the pre–1986 version of I.C. § 12–120. Although that version refers to "any civil action to recover on ... [a] contract relating to the purchase or sale of goods," this case—strictly speaking—did not involve a "sale of goods." As we have explained, the transaction between the parties closely resembled a sale, thereby justifying application of the UCC by analogy; but the policy reasons for analogous extension of UCC warranties do not carry over to attorney fee questions.

Neither do we believe this case warrants a discretionary award of attorney fees under I.C. § 12–121. An award under that statute could be made only upon a finding that the seed producer defended against the farmer's complaint "frivolously, unreasonably or without founda-tion...." I.R.C.P. 54(e)(1). The district court made such a finding, but its explanation for doing so focused in part on the seed producer's failure to offer a settlement or to respond to any settlement offer by the farmer. Our Supreme Court has held that refusal to engage in settlement negotiations is not a permissible basis for awarding attorney fees. *See Ross v. Coleman,* 114 Idaho 817, 836, 761 P.2d 1169, 1188 (1988). *Ross,* like *Myers,* was decided after the district court made its ruling in the present case.

An award of attorney fees under I.C. § 12–121 is a matter of discretion. Where, as here, such an exercise of discretion has been tainted by legal error, the proper appellate response usually is to remand the case for reconsideration in light of the proper legal framework. *Kunzler v. Kunzler,* 109 Idaho 350, 707 P.2d 461 (Ct. App.1985). A remand is unnecessary, however, when the appellate court is convinced that the lower court's ruling is an abuse of discretion in any event. *Id.*

Here, the issue of the seed producer's liability—predicated upon extension of the UCC by analogy—has been a fairly debatable question throughout this litigation. Attorney fee awards under I.C. § 12–121 are improper where the nonprevailing party has presented a "genuine and fairly debatable" issue. *Wing v. Amalgamated Sugar Co.,* 106 Idaho 905, 911, 684 P.2d 307, 313 (Ct.App.1984). Moreover, we have held that an attorney fee award is inappropriate under I.C. § 12–121 if the case is not controlled by existing Idaho authorities but instead "has helped to develop Idaho case law on the subject." *Shelton v. Boydstun Beach Ass'n,* 102 Idaho 818, 641 P.2d 1005 (Ct.App.1982). Accordingly, with all due respect to the capable district judge, we hold that the award of attorney fees in this case was an abuse of discretion and must be reversed.

In summary, the judgment of the district court is affirmed with respect to liability and damages, but is reversed with respect to attorney fees. Costs (exclusive of attor-

ney fees) are awarded on appeal to the respondent-farmer.

WALTERS, C.J., concurs.

SWANSTROM, Judge, dissenting in part.

I respectfully disagree with the majority's determination that the Uniform Commercial Code can be applied to this case by "analogy." In my view, Article 2 of the UCC is not applicable to a seedman's contract, particularly to the contract here. I believe there is no liability in this case under any theory of implied warranty under the UCC. Absent liability, there is no need to address any question relating to damages. I concur only in that part of the majority opinion which overturns an award of attorney fees to Clements Farms.

The majority opinion does not cite, and my research does not disclose, another case where Article 2 of the UCC has been extended to a seedman's contract. Unlike the majority, I do not think Article 2 applies simply because goods have changed hands in a commercial transaction. Rather, I think Article 2 applies only to sales and to certain well-recognized categories of transactions resembling sales. Leases constitute such a category, as the majority opinion states. This case does not involve a lease. The only other recognized category appears to be bailments, and even this category is not universally accepted. *See generally* Annot., *What Constitutes a Transaction, a Contract for Sale, or a Sale within the Scope of UCC Article 2,* 4 A.L.R. 4th 85 (1981 and later supplements). In extending the UCC's warranties to "bailments" the district court was led down a dubious path. The majority, seeking to arrive at the same destination, have blazed their own way. I cannot follow either route for the law and the facts guide me in a different direction.

In a typical seedman's contract, the seedman furnishes the seed and agrees to pay the grower for raising the seed, a certain sum per pound or bushel for all seed produced meeting the requirements of the contract. *Schoonover v. Igleheart Bros., Inc.,* 163 Kan. 689, 186 P.2d 109 (1947). These contracts have, under certain circumstances, been held to constitute bailments. *See Washburn–Wilson Seed Co. v. Alexie,* 54 Idaho 727, 35 P.2d 990 (1934); *Smith v. Washburn–Wilson Seed Co.,* 40 Idaho 191, 232 P. 574 (1925). The factor distinguishing a bailment contract, where the grower is merely hired to provide the service of producing the crop, from a contract for sale, where the grower is agreeing to sell the specified crop to a stated buyer, has been whether the agreement provides for title in the seed and in the resulting crop to remain in the party furnishing the seed. *Thiel v. Pacific Fruit & Produce Co.,* 51 Idaho 145, 4 P.2d 356 (1931). These earlier Idaho cases recognize that where title is reserved by the party furnishing the seed, the grower merely performs a service under a bailment, rather than owning the ultimate product. The most recent case recognizing and wholly applying the bailment concept to a seedman's contract was decided thirty years ago. *Kent v. Campbell,* 80 Idaho 57, 324 P.2d 398 (1958). The dispute was between two growers and their seed supplier. In *Kent,* however, all parties agreed that the contracts *initially* were bailment contracts. The disagreement was whether the seedman-bailor had—as he contended—rejected the crop grown by the bailees and thereafter had entered into a new oral agreement with them to sell their crop on a consignment basis.[1]

Recently, the application of the theory of bailment to seedman's contracts has been

1. The cases cited above all predate the adoption in Idaho of the Uniform Commercial Code. Consequently, the contracts construed in those cases all have language discussing passage and retention of title, a subject now of lesser importance under the UCC (*see* I.C. § 28–2–401) and recent Idaho Supreme Court decisions. *See, e.g., Peterson v. Conida Warehouses, Inc.,* 98 Idaho 883, 575 P.2d 481 (1978) (a bailment type contract between a seed supplier and a tenant farmer held ineffective as against the land owner's interest in the crop under a "share crop arrangement"). A similar holding occurred in *NBC Leasing Co. v. R & T Farms, Inc.,* 112 Idaho 500, 733 P.2d 721 (1987) (landowner's proprietary interest in one-third of the crop under a lease cannot be affected by any contract between the lessee-grower and the seed supplier even though the seed supplier had a perfected

questioned by members of our Supreme Court. *See Peterson v. Conida Warehouses, Inc.*, 98 Idaho 883, 575 P.2d 481 (1978) (Bakes, J., and Bistline, J., special concurring opinions). In *Chapman v. Haney Seed Co., Inc.*, 102 Idaho 26, 624 P.2d 408 (1981), the Court noted that the bailment theory had been "seriously criticized" and expressly avoided addressing the "question of 'bailment'." The court could do so because *Chapman*, like *Kent*, did not involve any third-party claims to the crop grown by the "bailee."

However, in special concurring opinions in *Peterson*, Justice Bistline and Justice Bakes agreed that the Court should not have sidestepped the issue. Justice Bistline suggested that seedman's contracts were first viewed as bailments in Idaho in 1922 when the Idaho Supreme Court uncritically adopted a Montana case which, on "tenuous ground," had applied "18th century English law of common carriers to Montana seed contracts." 98 Idaho at 887, 575 P.2d at 485. Justice Bistline concluded:

I submit that it is unrealistic to continue to indulge in the fiction that a bean, which is irretrievably planted in the ground, and whose very existence as a bean ceases as it turns into a plant, may be the subject of a bailment, entitling the supplier of the bean to claim all the beans produced from that plant. The parties essentially have entered into a joint venture, with the seed company supplying the seed beans, and the grower, ..., supplying the land in which the beans may be planted, together with all the labor which goes into planting, cultivating, harvesting, and hauling to the warehouse.... Here the grower's share was agreed upon at so much per hundred-weight, which seems to be what he was to receive for services rendered in the adventure, and not, by any stretch of the imagination, as compensation for storing the beans one inch apart in rows in the ground.

*Id.* at 887–8, 575 P.2d at 485–6.

Justice Bakes also wrote persuasively in his special concurrence:

security interest in the crop and the landowner

In my view, the bailment theory accepted in *Kent* should be rejected by this Court, not merely sidestepped as we have done in this case. I agree with Justice Bistline that it is stretching the concept of bailment beyond its breaking point to assert that one may deliver beans to another to plant them and harvest the crop and still retain title to the crop produced by the planting.

*Id.* at 886, 575 P.2d at 484.

I believe our Supreme Court has already abandoned the "tenuous ground" underlying the application of the bailment theory to seedman contracts. Any ground once supporting the theory has been seriously undercut by the decision of the Court in *Peterson* and *NBC Leasing Company*. These decisions have carved out "policy exception[s] to the *Kent* rule in favor of landlords (and perhaps in subsequent litigation other lien claimants) without expressly saying so." *Peterson* at 886, 575 P.2d at 484 (Bakes, J., special concurrence).

The concept that seedman's contracts are bailments has been directly challenged here. We are compelled to respond directly. I submit that our Supreme Court, if deciding this issue, would hold that seedman's contracts no longer should be construed as bailment contracts. Accordingly, we also should conclude that those cases applying UCC warranties to equipment leases, such as *Glenn Dick Equipment Co. v. Galey Construction Co.*, 97 Idaho 216, 541 P.2d 1184 (1975), and *All–States Leasing Co. v. Bass*, 96 Idaho 873, 538 P.2d 1177 (1975), should not be followed or extended here to create any implied warranties of fitness for a particular purpose.

The theory upon which this case was tried and upon which the district court held there was an implied warranty that the seed furnished to Clements was fit for a particular purpose cannot be sustained. Furthermore, no warranty can be based upon a "sale" of the seed to Clements. The parties agree that the seed producer,

did not perfect a security interest in the crop).

Ben Fish & Son, did not sell the seed in question to Clements. It is true that Ben Fish wanted its seed grown by farmers in different areas, including Idaho. Ben Fish also wanted to purchase some of the crops produced from its seed to assure a continuing supply of seed. For these purposes, Ben Fish supplied Shields of Idaho, Inc. (Shields), an independent warehouse, with seed. Shields entered into its own contracts with some of its farmer customers to grow the seed. Some of this seed was in turn contracted by Shields to be sold to Ben Fish. It is undisputed that Ben Fish provided Shields with relevant information about the maturational characteristics of this particular seed, at least what was known from growing the seed elsewhere. It is also undisputed that Shield's employees had instructions to inform its farmer customers about growing requirements of the lima bean seed at issue here.

On or about March 6, 1985, Clements Farms signed a seedman's contract with Shields agreeing to plant and grow eighty acres of beans for Shields, using a specified "Green Baby Lima" seed. The contract placed all risk on Clements Farms for any crop failure and all warranties regarding the seed furnished were expressly waived. The contract stated that Clements would pay Shields $37 per hundred-weight for the seed it was to grow. When Clements signed the Shields contract to grow the green lima bean seed, Clements had no contact whatsoever with Ben Fish. Clements has not contended that Shields was the agent for Ben Fish and the proof at trial does not suggest any agency relationship.

Pursuant to its contract with Clements, Shields delivered the bean seed to Clements Farms about May 8. Thus, if there was any transaction in this case which—to use the words of the majority opinion—"resembled a sale of goods," or could give rise to any implied warranties, it was this transaction. Even though some weeks later the Shields–Clements contract was voided and replaced by the Ben Fish–Clements contract, the record shows that Clements remained liable to Shields for the seed which Shields had previously delivered to Clements Farms.

The majority opinion ignores the fact that Clements decided as early as March 6, 1985, to grow this particular seed for Shields. The majority also did not mention that Shields delivered this seed to Clements on or about May 8. The majority did not mention that Clements remained liable to Shields, not to Ben Fish, for the cost of the seed. The later contract between Ben Fish and Clements said nothing about the cost of seed. It recited only that Clements agreed to raise "80 acres of GBL 8–78 Lima Beans ... with Stock Seed furnished by" Ben Fish. In focusing upon this "furnished by" language of the contract, the majority ignored the fact that when the seed was selected, purchased and delivered Clements was dealing with Shields, not with Ben Fish. The evidence will not support a finding that Clements, an extensive agri-business operated by an experienced farmer-businessman, was relying on Ben Fish's skill or judgment in choosing to grow the lima bean crop. As noted, Clements contacted Ben Fish only after Clements learned of Shield's shaky financial situation. Clements wanted to avoid entangling itself and the prospective crop in any bankruptcy proceeding involving Shields. Ben Fish then became concerned because of its own plans and commitments which were based in part on the contract Clements had made with Shields in March to produce eighty acres of the desired bean seed. These are the circumstances which brought Ben Fish and Clements together. These circumstances produced a simple seedman's contract by which Clements agreed to grow a crop of beans for Ben Fish.

The majority would have the reader of this opinion believe that Ben Fish designated itself a "seller" in this contract. The only place where the word appears is in a printed disclaimer which is part of the Ben Fish letterhead. The disclaimer is *above* the contract. The contract itself, which just happened to be typed on the letterhead, does not even contain the word "seller." This "labeling" attempt will not stick.

In summary, the evidence does not show that Ben Fish was a "seller" of goods who

**220**

had reason to know that Clements was relying on Ben Fish to furnish appropriate goods. Nor does the evidence show that Clements did in fact rely upon Ben Fish's skill or judgment. The requirements of I.C. § 28–2–315 have not been met.

Finally, there was nothing wrong with the seed "furnished by" Ben Fish. Crops were successfully grown in Idaho using this seed despite the fact that the lima bean had a longer maturation time than the pinto beans which Clements usually grew. Other factors, including Clements's two-week delay in planting the crop after signing the Ben Fish contract, contributed to the crop failure. In any event, we have not been shown any basis for holding that the implied warranty of fitness for a particular purpose applied to this transaction. Accordingly, I would reverse the judgment.